# STATE OF MICHIGAN

# COURT OF APPEALS

---

MELISSA MAYS, MICHAEL ADAM MAYS, JACQUELINE PEMBERTON, KEITH JOHN PEMBERTON, ELNORA CARTHAN, RHONDA KELSO, and ALL OTHERS SIMILARLY SITUATED,

        Plaintiffs-Appellees/Cross-Appellees/Cross-Appellants,

v

GOVERNOR RICK SNYDER, STATE OF MICHIGAN, MICHIGAN DEPARTMENT OF ENVIRONMENTAL QUALITY, and MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES,

        Defendants-Appellants/Cross-Appellees,

and

DARNELL EARLEY and JERRY AMBROSE,

        Defendants/Cross-Appellants/Cross-Appellees,

and

CITY OF FLINT,

        Not Participating.

FOR PUBLICATION
January 25, 2018
9:00 a.m.

No. 335555
Court of Claims
LC No. 16-000017-MM

---

MELISSA MAYS, MICHAEL ADAM MAYS, JACQUELINE PEMBERTON, KEITH JOHN PEMBERTON, ELNORA CARTHAN, RHONDA KELSO, and ALL OTHERS SIMILARLY SITUATED,

        Plaintiffs-Appellees,

-1-

v

GOVERNOR RICK SNYDER, STATE OF
MICHIGAN, MICHIGAN DEPARTMENT OF
ENVIRONMENTAL QUALITY, and
MICHIGAN DEPARTMENT OF HEALTH AND
HUMAN SERVICES,

        Defendants,

and

DARNELL EARLEY, and JERRY AMBROSE,

        Defendants-Appellants,

and

CITY OF FLINT,

        Not Participating.

No. 335725
Court of Claims
LC No. 16-000017-MM

---

MELISSA MAYS, MICHAEL ADAM MAYS,
JACQUELINE PEMBERTON, KEITH JOHN
PEMBERTON, ELNORA CARTHAN, RHONDA
KELSO, and ALL OTHERS SIMILARLY
SITUATED,

        Plaintiffs-Appellees,

v

GOVERNOR RICK SNYDER, STATE OF
MICHIGAN, MICHIGAN DEPARTMENT OF
ENVIRONMENTAL QUALITY, and
MICHIGAN DEPARTMENT OF HEALTH AND
HUMAN SERVICES,

        Defendants-Appellants,

and

DARNELL EARLEY and JERRY AMBROSE,

        Defendants,

and

No. 335726
Court of Claims
LC No. 16-000017-MM

-2-

CITY OF FLINT,

Not Participating.

Before: JANSEN, P.J., and FORT HOOD and RIORDAN, JJ.

JANSEN, P.J.

This case involves consolidated appeals from an October 26, 2016 opinion and order of the Court of Claims granting partial summary disposition in favor of defendants Governor Rick Snyder, the State of Michigan, the Michigan Department of Environmental Quality (DEQ), and the Michigan Department of Health and Human Services (DHHS) (collectively "state defendants"), and defendants Darnell Earley and Jerry Ambrose (city defendants), who are former emergency managers for the city of Flint, in this putative class action suit brought by plaintiff water users and property owners in the city of Flint, Michigan. For the reasons that follow, we affirm.

I. FACTS AND PROCEDURE

This case arises from the situation commonly referred to as the "Flint water crisis." The lower court record is only modestly developed, and the facts of the case are highly disputed. Because this is an appeal from an opinion of the Court of Claims partially granting and partially denying defendants' motion for summary disposition, we must construe the factual allegations in a light most favorable to plaintiffs.[1] The Court of Claims summarized the factual allegations in plaintiffs' complaint as follows:

> From 1964 through late April 2014, the Detroit Water and Sewage Department ("DWSD") supplied Flint water users with their water, which was drawn from Lake Huron. Flint joined Genesee, Sanilac, and Lapeer Counties and the City of Lapeer, in 2009, to form the Karegondi Water Authority ("KWA") to explore the development of a water delivery system that would draw water from Lake Huron and serve as an alternative to the Detroit water delivery system. On March 28, 2013, the State Treasurer recommended to the Governor that he

---

[1] See *Dalley v Dykema Gossett PLLC*, 287 Mich App 296, 304-305; 788 NW2d 679 (2010) (explaining that in deciding a motion under MCR 2.116(C)(8), this Court must accept the allegations as true and construe them in a light most favorable to the nonmoving party); *Willett v Charter Twp of Waterford*, 271 Mich App 38, 45; 718 NW2d 386 (2006) (noting that when deciding a motion under MCR 2.116(C)(7), "all well-pleaded allegations must be accepted as true and construed in favor of the nonmoving party," unless contradicted by the submitted evidence); *Cork v Applebee's of Mich, Inc*, 239 Mich App 311, 315; 608 NW2d 62 (2000) (explaining that genuine issues of material fact regarding a court's subject-matter jurisdiction preclude summary disposition under MCR 2.116(C)(4)).

-3-

authorize the KWA to proceed with its plans to construct the alternative water supply system. The State Treasurer made this decision even though an independent engineering firm commissioned by the State Treasurer had concluded that it would be more cost efficient if Flint continued to receive its water from the DWSD. Thereafter, on April 16, 2013, the Governor authorized then-Flint Emergency Manager Edward Kurtz to contract with the KWA for the purpose of switching the source of Flint's water from the DWSD to the KWA beginning in mid-year 2016.

At the time Emergency Manager Kurtz contractually bound Flint to the KWA project, the Governor and various state officials knew that the Flint River would serve as an interim source of drinking water for the residents of Flint. Indeed, the State Treasurer, the emergency manager and others developed an interim plan to use Flint River water before the KWA project became operational. They did so despite knowledge of a 2011 study commissioned by Flint officials that cautioned against the use of Flint River water as a source of drinking water and despite the absence of any independent state scientific assessment of the suitability of using water drawn from the Flint River as drinking water.

On April 25, 2014, under the direction of then Flint Emergency Manager Earley and the Michigan Department of Environmental Quality ("MDEQ"), Flint switched its water source from the DWSD to the Flint River and Flint water users began receiving Flint River water from their taps. This switch was made even though Michael Glasgow, the City of Flint's water treatment plant's laboratory and water quality supervisor, warned that Flint's water treatment plant was not fit to begin operations. The 2011 study commissioned by city officials had noted that Flint's long dormant water treatment plant would require facility upgrades costing millions of dollars.

Less than a month later, state officials began to receive complaints from Flint water users about the quality of the water coming out of their taps. Flint residents began complaining in June of 2014 that they were becoming ill after drinking tap water. On October 13, 2014, General Motors announced that it was discontinuing the use of Flint water in its Flint plant due to concerns about the corrosive nature of the water. That same month, Flint officials expressed concern about a Legionellosis outbreak and possible links between the outbreak and Flint's switch to river water. On February 26, 2015, the United States Environmental Protection Agency ("EPA") advised the MDEQ that the Flint water supply was contaminated with iron at levels so high that the testing instruments could not measure the exact level. That same month, the MDEQ was also advised of the opinion of Miguel Del Toral of the EPA that black sediment found in some of the tap water was lead.

During this time, state officials failed to take any significant remedial measures to address the growing public health threat posed by the contaminated water. Instead, state officials continued to downplay the health risk and advise Flint water users that it was safe to drink the tap water while at the same time

-4-

arranging for state employees in Flint to drink water from water coolers installed in state buildings. Additionally, the MDEQ advised the EPA that Flint was using a corrosion control additive with knowledge that the statement was false.

By early March 2015, state officials knew they faced a public health emergency involving lead poisoning and the presence of the deadly Legionella bacteria, but actively concealed the health threats posed by the tap water, took no measures to effectively address the dangers, and publicly advised Flint water users that the water was safe and that there was no widespread problem with lead leaching into the water supply despite knowledge that these latter two statements were false.

Through the summer and into the fall of 2015, state officials continued to cover up the health emergency, discredit reports from Del Toral of the EPA and Professor Marc Edwards of Virginia Tech confirming serious lead contamination in the Flint water system, conceal critical information confirming the presence of lead in the water system, and advise the public that the drinking water was safe despite knowledge to the contrary. In the fall of 2015, various state officials attempted to discredit the findings of Dr. Mona Hann-Attisha of Hurley Hospital, which reflected a "spike in the percentage of Flint children with elevated blood lead levels from blood drawn in the second and third quarter of 2014."

In early October of 2015, however, the Governor acknowledged that the Flint water supply was contaminated with dangerous levels of lead. He ordered Flint to reconnect to the Detroit water system on October 8, 2015, with the reconnection taking place on October 16, 2015. This suit followed. [*Mays v Snyder*, unpublished opinion of the Court of Claims, issued October 26, 2016 (Docket No. 16-000017-MM), pp 3-6 (citation omitted).]

On January 21, 2016, plaintiffs brought a four-count verified class action complaint against all defendants in the Court of Claims "on behalf of Flint water users, which include but are not limited to, tens of thousands of residents . . . of the City of Flint." Plaintiffs brought their complaint pursuant to the Due Process/Fair and Just Treatment and unjust taking clauses of Article 1, § 17 and Article 10, § 2 of the Michigan Constitution alleging that since "April 25, 2014 to the present, [plaintiffs] have experienced and will continue to experience serious personal injury and property damage caused by Defendants' deliberately indifferent decision to expose them to the extreme toxicity of water pumped from the Flint River into their homes, schools, hospitals, correctional facilities, workplaces and public places." Specifically, plaintiffs alleged that defendants (1) "knowingly took from Plaintiffs safe drinking water and replaced it with what they knew to be a highly toxic alternative solely for fiscal purposes," (2) for more than 18 months, ignored irrefutable evidence that the Flint River water was extremely toxic and causing serious injury to persons and property, (3) failed to properly sample and monitor the Flint River water, (4) knowingly delivered false assurances that the Flint River water was being tested and treated and was safe to drink, and (5) deliberately delayed notification to the public of serious safety and health risks.

Plaintiffs sought class certification and elected to pursue causes of action against all defendants for state-created danger (Count I), violation of plaintiffs' due process right to bodily integrity (Count II), denial of fair and just treatment during executive investigations (Count III), and unconstitutional taking via inverse condemnation (Count IV). Plaintiffs sought an award of economic and noneconomic damages for, among other things, bodily injury, pain and suffering, and property damage, for "deliberately indifferent fraud" and "unconscionable" deception on the part of defendants while acting in their official capacities.

State and city defendants separately moved for summary disposition on all four counts, arguing that, among other things, plaintiffs had (1) failed to satisfy the statutory notice requirements of MCL 600.6431, (2) failed to allege facts to establish a constitutional violation for which a judicially inferred damages remedy is appropriate, and (3) failed to allege facts to establish the elements of any of their claims. In a detailed opinion and order, the Court of Claims granted defendants' motions for summary disposition on plaintiffs' causes of action under the state-created danger doctrine and the Fair and Just Treatment Clause of the Michigan Constitution, after concluding that neither cause of action is cognizable under Michigan law.[2] However, the court denied summary disposition on all of defendants' remaining grounds.

## II. STATUTORY NOTICE REQUIREMENTS

On appeal, defendants first argue that the Court of Claims erred when it denied defendants' motions for summary disposition under MCR 2.116(C)(4) and (C)(7) because plaintiffs failed to satisfy the requirement of statutory notice to avoid governmental immunity and seek relief against the state in the Court of Claims. We disagree.

"We review a trial court's decision regarding a motion for summary disposition de novo." *City of Fraser v Almeda Univ*, 314 Mich App 79, 85; 886 NW2d 730 (2016). A motion for summary disposition under MCR 2.116(C)(4) tests the trial court's subject-matter jurisdiction. *Weishuhn v Catholic Diocese of Lansing*, 279 Mich App 150, 154; 756 NW2d 483 (2008). "We review a trial court's decision on a motion for summary disposition based on MCR 2.116(C)(4) de novo to determine if the moving party was entitled to judgment as a matter of law, or if affidavits or other proofs demonstrate there is an issue of material fact." *Southfield Educ Assoc v Bd of Educ of Southfield Pub Sch*, 320 Mich App 380, ___; ___ NW2d ___ (2017) (Docket No. 331087), slip op at 10 (quotation marks and citation omitted). Whether a court has subject-matter jurisdiction over a claim is a question of law this Court reviews de novo. *Jamil v Jahan*, 280 Mich App 92, 99-100; 760 NW2d 266 (2008). Likewise, "whether MCL 600.6431 requires dismissal of a plaintiff's claim for failure to provide the designated notice raises questions of statutory interpretation," which this Court reviews de novo. *McCahan v Brennan*, 492 Mich 730, 736; 822 NW2d 747 (2012).

Summary disposition under MCR 2.116(C)(7) is appropriate when a claim is barred because of immunity granted by law. *Dextrom v Wexford Co*, 287 Mich App 406, 428; 789

---

[2] On appeal, plaintiffs take no issue with the Court of Claims' dismissal of their claim for violation of the Fair and Just Treatment Clause.

NW2d 211 (2010). "When reviewing a motion under MCR 2.116(C)(7), this Court must accept all well-pleaded factual allegations as true and construe them in favor of the plaintiff, unless other evidence contradicts them." *Id*. "If no material facts are in dispute, or if reasonable minds could not differ regarding the legal effect of the facts, the question whether the claim is barred by governmental immunity is an issue of law." *Willett v Charter Twp of Waterford*, 271 Mich App 38, 45; 718 NW2d 386 (2006) (quotation marks, citation, and alteration marks omitted).

We hold that the Court of Claims did not err when it determined that genuine issues of material fact still exist regarding whether plaintiffs satisfied the statutory notice requirements of MCL 600.6431. Further, we hold that the harsh and unreasonable consequences exception relieves plaintiffs from the statutory notice requirements and that, depending on plaintiffs' ability to prove the allegations of their complaint, the fraudulent concealment exception of MCL 600.5855 may provide an alternative basis to affirm the court's denial of summary disposition.

## A. STATUTORY NOTICE REQUIREMENTS

In Michigan, governmental agencies engaged in governmental functions are generally immune from tort liability. *Kline v Dep't of Transp*, 291 Mich App 651, 653; 809 NW2d 392 (2011). The government, by statute, may voluntarily subject itself to liability and "may also place conditions or limitations on the liability imposed." *McCahan*, 492 Mich at 736. "Indeed, it is well established that the Legislature may impose reasonable procedural requirements, such as a limitations period, on a plaintiff's available remedies even when those remedies pertain to alleged constitutional violations." *Rusha v Dep't of Corrections*, 307 Mich App 300, 307; 859 NW2d 735 (2014). "[I]t being the sole province of the Legislature to determine whether and on what terms the state may be sued, the judiciary has no authority to restrict or amend those terms." *McCahan*, 492 Mich at 732. Thus, "no judicially created savings construction is permitted to avoid a clear statutory mandate." *Id*. at 733. When the language of a limiting statute is straightforward, clear, and unambiguous, it must be enforced as written. *Rowland v Washtenaw Co Rd Comm*, 477 Mich 197, 219; 731 NW2d 41 (2007).

One statutory condition on the right to sue governmental agencies of the state of Michigan is the notice provision of the Court of Claims Act (CCA), MCL 600.6401 *et seq*. *McCahan*, 492 Mich at 736. The provision, MCL 600.6431, provides:

> (1) No claim may be maintained against the state unless the claimant, within 1 year after such claim has accrued, files in the office of the clerk of the court of claims either a written claim or a written notice of intention to file a claim against the state or any of its departments, commissions, boards, institutions, arms or agencies, stating the time when and the place where such claim arose and in detail the nature of the same and of the items of damage alleged or claimed to have been sustained, which claim or notice shall be signed and verified by the claimant before an officer authorized to administer oaths.
>
> * * *
>
> (3) In all actions for property damage or personal injuries, claimant shall file with the clerk of the court of claims a notice of intention to file a claim or the

claim itself within 6 months following the happening of the event giving rise to the cause of action.

Our Supreme Court has directed that "[c]ourts may not engraft an actual prejudice requirement or otherwise reduce the obligation to comply fully with the statutory notice requirements." *McCahan*, 492 Mich at 747. The notice requirement of MCL 600.6431 is an unambiguous "condition precedent to sue the state," *McCahan v Brennan*, 291 Mich App 430, 433; 804 NW2d 906 (2011), aff'd 492 Mich 730 (2012), and a claimant's failure to strictly comply warrants dismissal of the claim," *McCahan*, 492 Mich at 746-747.

There is no dispute that plaintiffs' action involves personal injury and property damage. Plaintiffs filed their complaint in the instant suit on January 21, 2016, without having filed a separate notice of intention to file a claim. Thus, to have strictly complied with the notice requirement of MCL 600.6431, plaintiffs' claims must have accrued on or after June 21, 2015, the date six months prior to the date of filing. Defendants argue that plaintiffs' claims accrued, and the statutory notice period began to run, in either June of 2013, when plaintiffs allege that the state "ordered and set in motion the use of highly corrosive and toxic Flint river water knowing that the [water treatment plant] was not ready," or on April 25, 2014, when Flint's water source was switched over to the Flint River and residents began receiving Flint River water from their taps. In either circumstance, according to defendants, plaintiffs' complaint was not filed within the six-month statutory notice period and plaintiffs' claims must be dismissed. As the Court of Claims observed, accepting defendants' position would require a finding that plaintiffs should have filed suit or provided notice at a time when the state itself claims it had no reason to know that the Flint River water was contaminated. Like the Court of Claims, we are disinclined to accept defendants' position.

At a minimum, summary disposition on this ground is premature. Plaintiffs have alleged personal injury and property damage sustained as a result of defendants' allegedly knowing and deliberate decision to supply plaintiffs with contaminated and unsafe drinking water. Although defendants assert that plaintiffs' causes of action could only have arisen on the date of the physical switch, our Legislature has not defined claim accrual so narrowly. Rather, for purposes of statutory limitations periods, our Legislature has stated that a claim accrues "at the time the wrong upon which the claim is based was done," MCL 600.5827, and our Supreme Court has clarified that "the 'wrong' . . . is the date on which the defendant's breach harmed the plaintiff, as opposed to the date on which defendant breached his duty." *Frank v Linkner*, 500 Mich 133, ___; 894 NW2d 574, 582 (2017).[3] Thus, the date on which defendants acted to switch the water is not necessarily the date on which plaintiffs suffered the harm giving rise to their causes of action. Although our Supreme Court has abrogated the application of the discovery doctrine in this state, it has also made clear that it is not until "all of the elements of an action for . . . injury,

---

[3] The Legislature imported this definition of claim accrual into the CCA under MCL 600.6452(2), which states that "[e]xcept as modified by this section, the provisions of RJA chapter 58, relative to the limitation of actions, shall also be applicable to the limitation prescribed in this section." (Citation omitted.)

including the element of damage, are present, [that] the claim accrues and the statute of limitations begins to run." *Marilyn Froling Revocable Living Trust v Bloomfield Hills Country Club*, 283 Mich App 264, 290; 769 NW2d 234 (2009), quoting *Connelly v Paul Ruddy's Equip Repair and Serv Co*, 388 Mich 146, 151; 200 NW2d 70 (1972). In other words, while a claimant's knowledge of each element of a cause of action is not necessary for claim accrual, a claim does not accrue until each element of the cause of action, including some form of damages, *exists*. See *Henry v Dow Chem Co*, 319 Mich App 704, ___; ___ NW2d ___ (2017) (Docket No. 328716), slip op at 7. Determination of the time at which plaintiffs' claims accrued therefore requires a determination of the time at which plaintiffs were first harmed. See *id.*

Plaintiffs allege various affirmative actions taken by defendants in this case that resulted in distinct harm to plaintiffs. As plaintiffs concede, not every injury suffered by every user of Flint water is necessarily actionable. However, questions of fact remain regarding whether and when each plaintiff suffered injury and when each plaintiff's claims accrued relative to the filing of plaintiffs' complaint. For example, plaintiffs have alleged economic damage in the form of lost property value that did not occur on the date of the water switch. Plaintiffs' claim for lack of marketability did not accrue until the values of their homes decreased, which would have occurred when the water crisis became public and marketability of property in Flint became significantly impaired in October 2015. Further, it is not clear on what date plaintiffs suffered actionable personal injuries as a result of their use and consumption of the contaminated water. Plaintiffs should be permitted to conduct discovery and given the opportunity to prove the dates on which their distinct harms first arose before summary disposition may be appropriate.[4] This is especially true where, as here, there are multiple events giving rise to plaintiffs causes of action.[5] "[T]he fact that some of [a] plaintiff's claims accrued outside the limitations period does not time-bar all of the plaintiff's claims." *Dep't of Environmental Quality v Gomez*, 318 Mich App 1, 28; 896 NW2d 39 (2016).

Thus, even if strict compliance with the statutory notice provision is required, summary disposition, at least at this juncture, is premature. Further, as the Court of Claims observed, there

---

[4] Defendants argue that the Court of Claims erred in relying "only" on hypothetical claims of putative class members to find remaining issues of fact. It is true that a plaintiff who has not suffered an injury "cannot maintain the cause of action as an individual is not qualified to represent [a] proposed class." *Doe v Henry Ford Health Sys*, 308 Mich App 592, 604; 865 NW2d 915 (2014) (quotation marks and citation omitted.) However, the issue of class certification has not yet been raised and, in any case, defendants' argument is not supported by the record. The Court of Claims fully considered plaintiffs' complaint and cited specific allegations by plaintiffs in this case before concluding that questions of fact remained regarding plaintiffs' ability to establish claims accruing later than the date of the water switch.

[5] The Court of Claims did not err in recognizing that plaintiffs' complaint alleges multiple harms resulting from distinct tortious acts, rather than a continuing harm resulting from the single tortious act of switching the water source. For purposes of accrual, each of plaintiffs' individual causes of action must be considered separately. See *Joliet v Pitoniak*, 475 Mich 30, 42; 715 NW2d 60 (2006).

are factual questions that, if resolved in plaintiffs' favor, would justify "relieving [plaintiffs] of the requirements of" MCL 600.6431(3). *Rusha*, 307 Mich App at 312.

## B. HARSH AND UNREASONABLE CONSEQUENCES

Plaintiffs have asserted only constitutional claims against the state and various agencies. In *Rusha*, 307 Mich App at 311, the Court of Appeals acknowledged that "Michigan courts routinely enforce statutes of limitations where constitutional claims are at issue." However, the Court also acknowledged an exception to enforcement when strict enforcement of a limitations period is so harsh and unreasonable in its consequences that it "effectively divest[s]" a plaintiff "of the access to the courts intended by the grant of [a] substantive right." *Rusha*, 307 Mich App at 311 (citation omitted). The Court then noted that there is no obvious reason not to extend this exception, typically applied to relieve a plaintiff of the effects of statutory limitations periods, to statutory notice requirements. Specifically considering MCL 600.6431(3), the *Rusha* Court opined:

> We see no reason—and plaintiff has provided none—to treat statutory notice requirements differently [than statutes of limitations]. Indeed, although statutory notice requirements and statutes of limitations do not serve identical objectives, both are procedural requirements that ultimately restrict a plaintiff's remedy, but not the substantive right. [*Rusha*, 307 Mich App at 311-312 (citations omitted).]

Defendants argue that *Rusha* was incorrectly decided and should not influence our decision here. Specifically, defendants assert that the *Rusha* Court's conclusions, first that a harsh and unreasonable consequences exception may relieve plaintiffs from the statute of limitations and second that the same exception applies to statutory notice requirements, are directly contradicted by three earlier decisions of the Michigan Supreme Court: *Trentadue v Buckler Lawn Sprinkler*, 479 Mich 378; 738 NW2d 664 (2007); *Rowland*, 477 Mich 197, and *McCahan*, 492 Mich 730. Defendants argue that these cases unequivocally prohibit the application of any type of judicial "saving construction" to avoid the "clear statutory mandate" of a legislatively-imposed limitations period. Defendants are correct that these cases stand for the proposition that a court may not craft an exception to the statutory notice or limitations periods by recognizing viability of a substantially compliant notice, engrafting a prejudice requirement, or similarly reducing the requirements of the statute, even where constitutional claims are at issue. Indeed, the Court in *Rusha* acknowledged that "a claimant's failure to comply strictly with [the notice provision of MCL 600.6431] warrants dismissal of the claim, even if no prejudice resulted." *Rusha*, 307 Mich App at 307, citing *McCahan*, 492 Mich 746-747. However, the Court also recognized that the strict compliance requirement must be set aside when its application completely divests a plaintiff of the opportunity to assert a substantive right. *Id.* at 311. Despite defendants' assertion to the contrary, *Rusha* should not be read as advocating for the creation of a judicial saving construction to supplement an otherwise valid statute. Rather, it seems that the *Rusha* Court properly recognized the long-standing principle that while the Legislature retains the authority to impose *reasonable* procedural restrictions on a claimant's

pursuit of claims under self-executing constitutional provisions, "the right guaranteed shall not be curtailed or any undue burdens placed thereon." *Id*. at 308, quoting *Durant v Dep't of Ed (On Second Remand)*, 186 Mich App 83, 98; 463 NW2d 461 (1990).[6]

The Michigan Constitution is the preeminent law of our land, and its provisions restrict the conduct of the state government. See *Burdette v State*, 166 Mich App 406, 408; 421 NW2d 185 (1988). Indeed, the Due Process Clause of the Michigan Constitution, as a Declaration of Rights provision, "ha[s] consistently been interpreted as *limited* to protection against state action." *Sharp v Lansing*, 464 Mich 792, 813; 629 NW2d 873 (2001) (emphasis added). The Legislature may not impose a procedural requirement that would, in practical application, completely divest an individual of his ability to enforce a substantive right guaranteed thereunder. The harsh and unreasonable consequences exception is merely a judicial recognition that in limited cases, where the practical application of the Legislature's statutorily imposed procedural requirements are "unreasonable" or completely divest a claimant of his right to pursue a constitutional claim, those procedural requirements are unconstitutional.

The *Rusha* Court's recognition of this limitation on legislative power does not conflict with the holdings in *Trentadue*, *Rowland*, or *McCahan*.[7] Importantly, these cases advocate strict compliance with statutory limitations and notice requirements in the context of legislatively granted rights, rather than on rights granted under the provisions of our Constitution itself. See *McCahan*, 492 Mich at 733 (considering the statutory notice period in relation to a claim for personal injury and property damage arising from a motor vehicle accident); *Trentadue*, 479 Mich at 386-387 (considering the statute of limitations on a wrongful death action); *Rowland*, 477 Mich at 200 (considering the statutory notice period for a claim against a county defendant under a statutory exception to governmental liability). The right to pursue the tort claims involved in each arose from enumerated exceptions to the governmental tort liability act (GTLA), MCL 691.1401 *et seq*.; allowances structured by the Legislature's own authority and therefore subject to the Legislature's discretion. Additionally, *Rusha* was decided years after each of these cases, and is supported by precedent that has not been overruled.[8]

---

[6] The Due Process Clause of the Michigan Constitution proscribes specific conduct and sets forth "a sufficient rule by means of which the right which it grants may be enjoyed and protected," and is therefore self-executing. See *Rusha*, 307 Mich App at 308-309; see also *Santiago v New York State Dep't of Correctional Servs*, 945 F2d 25, 27 (CA 2, 1991) (considering the coextensive clause of the United States Constitution and opining that the substantive provisions of the Fourteenth Amendment are self-executing in nature). Indeed, the presumption is that all provisions of the Constitution, unless drafted only to reflect mere general principles, are self-executing. *Detroit v Oakland Circuit Judge*, 237 Mich 446, 450; 212 NW 217 (1927).

[7] Because we find no conflict between *Rusha* and the earlier Michigan Supreme Court cases cited by defendants here, we decline defendants' request to convene a conflict panel under MCR 7.215(J).

[8] State defendants direct this Court's attention to *Bacon v Michigan*, unpublished opinion of the Court of Claims, issued June 7, 2017 (Docket No. 16-000312-MM), in which the court suggested

Applying the harsh and unreasonable consequences exception to the facts presented in *Rusha*, the Court concluded that there was no reason to relieve the plaintiff from the requirement of strict compliance with the statutory notice requirement. *Id.* at 312-313. The Court explained:

> Here, it can hardly be said that application of the six-month notice provision of § 6431(3) effectively divested plaintiff of the ability to vindicate the alleged constitutional violation or otherwise functionally abrogated a constitutional right. Again, plaintiff waited nearly 28 months to file his claim. But § 6431(3) would have permitted him to file a claim on this very timeline had he only provided notice of his intent to do so within six months of the claim's accrual. Providing such notice would have imposed only a minimal procedural burden, which in any event would be significantly less than the "minor 'practical difficulties' facing those who need only make, sign and file a complaint within six months." To be sure, providing statutory notice " 'requires only ordinary knowledge and diligence on the part of the injured and his counsel, and there is no reason for relieving them from the requirements of this [statutory notice provision] that would not be applicable to any other statute of limitation.' " [*Id.* (citations omitted).]

Here, unlike in *Rusha*, application of the harsh and unreasonable consequences exception is clearly supported. To grant defendants' motions for summary disposition at this early stage in the proceedings would deprive plaintiffs of access to the courts and effectively divest them of the ability to vindicate the constitutional violations alleged. As the Court of Claims observed, this is not a case where an ostensible, single event or accident has given rise to a cause of action, but one where the "event giving rise to the cause of action was not readily apparent at the time of its happening." *Mays*, unpub op at 10. "Similarly, a significant portion of the injuries alleged to persons and property likely became manifest so gradually as to have been well established before

---

in a footnote that "defendants appear correct in their argument that the statement [from *Rusha* recognizing a harsh and unreasonable consequence exception] is no longer a valid statement of law as it pertains to statutes of limitations[.]" *Id.* at 8 n 5. The Court of Claims correctly noted that in *Curtin v Dep't of State Highways*, 127 Mich App 160; 339 NW2d 7 (1983), the case cited by *Rusha*, the Court relied for this language on a now-abrogated opinion, *Reich v State Highway Dep't*, 386 Mich 617; 194 NW2d 700 (1972), abrogated by *Rowland*, 477 Mich at 206-207. *Id.* However, the court incorrectly concluded that because *Curtin* cited bad case law, the principle announced in *Rusha* is "no longer [] valid." Our courts have recognized a harsh and unreasonable consequences exception to the Legislature's statute of limitations in various lines of cases that have not been overruled. Most recently, this Court affirmed the application of the exception in *Genesee Co Drain Comm'r v Genesee Co*, 309 Mich App 317, 332-333; 869 NW2d 635 (2015), with the same language employed by the Court in *Rusha*. *Rusha*'s detailed discussion of the exception and its application to the statutory notice period remains valid despite the citation error.

We would note that the Michigan Supreme Court denied leave to appeal the *Rusha* decision. *Rusha v Dep't of Corrections*, 498 Mich 860; 865 NW2d 28 (2015).

becoming apparent to plaintiffs because the evidence of injury was concealed in the water supply infrastructure buried beneath Flint and in the bloodstreams of those drinking the water supplied via that infrastructure." *Id*. at 10-11. Plaintiffs in this case did not wait more than two years after discovering their claims to file suit. Rather, they filed suit within six months of the state's public acknowledgment and disclosure of the toxic nature of the Flint River water plaintiffs were exposed to.

Further supporting the application of the harsh and unreasonable consequences exception to the requirement of statutory notice are plaintiffs' allegations of affirmative acts undertaken by numerous state actors, including named defendants, between April 25, 2014 and October 2015, to conceal both the fact that the Flint River water was contaminated and hazardous, and the occurrence of any event that would trigger the running of the six-month notice period. Under these unique circumstances, to file statutory notice within six months of the date of the water source switch would have required far more than ordinary knowledge and diligence on the part of plaintiffs and their counsel. It would have required knowledge that defendants themselves claim not to have possessed at the time plaintiffs' causes of action accrued.[9]

Should plaintiffs' allegations be proven true, defendants' affirmative acts of concealment and frustration of plaintiffs' discovery of the alleged causes of action should not be rewarded. It would be unreasonable to divest plaintiffs of the opportunity to vindicate their substantive, constitutional rights simply because defendants successfully manipulated the public long enough to outlast the statutory notice period. Although circumstances such as these will undoubtedly be few, we believe that in this unique situation, we must not set a standard whereby the state and its officers may completely avoid liability if they manage to intentionally delay discovery of a cause of action until the six-month statutory notice period has expired. Plaintiffs must be afforded the opportunity to support the allegations of their complaint before dismissal of their claims may be appropriate.

Because application of the harsh and unreasonable consequences exception to strict compliance with the statutory notice requirements is appropriate under the unique factual circumstances of this case, this Court need not consider whether, as defendants have asserted, plaintiffs improperly rely on the now-abrogated doctrines of discovery and continuing wrongs. Despite the unavailability of these previously-accepted principles, see *Henry*, 319 Mich App at

---

[9] We flatly reject defendants' contention that the burden on plaintiffs to file statutory notice within six months of the water switch would have been "minimal" because plaintiffs only needed to know that a claim was possible, not that a claim was fully supported, in order to provide timely notice. Defendants assume that plaintiffs had any knowledge of a possible claim during the period where, as plaintiffs allege, defendants were actively concealing information that a claim had accrued and the notice period had begun. If plaintiffs' allegations are proved true, filing notice within six months after the physical water switch would have placed more than a "minimal" burden on plaintiffs and their counsel. Indeed, it would have required clairvoyant recognition of circumstances that the state was working to convince the public did not actually exist.

___, slip op at 6-7, plaintiffs' constitutional tort claims survive summary disposition on the non-conflicting basis that dismissal would result in a harsh and unreasonable deprivation "of access to the courts intended by the grant of [a] substantive right." See *Rusha*, 307 Mich App at 311.

Finally, we briefly address the dissent's mention of similar pending Federal district court and circuit court actions. The dissent argues that even though plaintiffs are precluded from recovery due to their alleged failure to provide proper notice, "the residents of Flint are not left entirely without remedies," due to several pending actions in the United States District Court for the Eastern District of Michigan, and the United States Sixth Circuit Court of Appeals, including some actions in which the named plaintiff in this case is also involved. However, until those actions are fully resolved, any recovery is speculative. Further, where many federal statutory remedies are limited, the Court of Claims is able to fashion any reasonable remedy necessary to adequately address the Constitutional violations complained of by plaintiffs. Accordingly, we disagree with the dissent that plaintiffs are able to avoid any "harsh remedies" by seeking relief in the Federal courts.

## C. FRAUDULENT CONCEALMENT

In a footnote, the Court of Claims rejected plaintiffs' argument that the fraudulent concealment exception of MCL 600.5855 applied to toll the statute of limitations and the statutory notice period in this case. We find that the Court of Claims erred in reaching this conclusion, and hold that the fraudulent concealment exception may provide an alternative basis for affirming the denial of defendants' motions for summary disposition.

The fraudulent concealment exception is a legislatively-created exception to statutes of limitation. The exception is codified as part of the Revised Judicature Act (RJA), MCL 600.101 *et seq.*, in MCL 600.5855, which states:

> If a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations.

This statutory section permits the tolling of a statutory limitations period for two years if the defendant has fraudulently concealed the existence of a claim. For the fraudulent concealment exception to apply, a "plaintiff must plead in the complaint the acts or misrepresentations that comprised the fraudulent concealment," and "prove that the defendant committed affirmative acts or misrepresentations that were designed to prevent subsequent discovery." *Sills v Oakland Gen Hosp*, 220 Mich App 303, 310; 559 NW2d 348 (1996).

The Legislature, in crafting the CCA, imported the fraudulent concealment exception into its statute of limitations provision. MCL 600.6452(2). However, as defendants point out, the Legislature did not explicitly import the exception into the statutory notice provision of the CCA. See MCL 600.6431. The Court of Claims rejected plaintiffs' assertion that the fraudulent concealment exception should apply to the CCA's statutory notice requirement, finding the

-14-

absence of a similar provision directly applicable to MCL 600.643 "persuasive evidence that the Legislature did not intend for the fraudulent concealment tolling provision of MCL 600.5855 to be read into the notice provisions of MCL 600.6431." *Mays*, unpub op at 11-12 n 4. We disagree.

It is a basic tenant of statutory construction that the omission of a statutory provision should be construed as intentional. *CMAC LLC v Treasury Dep't*, 286 Mich App 365, 372; 781 NW2d 310 (2009). "Courts cannot assume that the Legislature inadvertently omitted from one statute the language that it placed in another statute, and then, on the basis of that assumption, apply what is not there." *Id*. (quotation marks and citation omitted). However, in this case, the Legislature did not "omit" from the CCA any language from the statute of limitations provisions of the RJA. Rather, the Legislature specifically *included* language mandating application of the RJA's statute of limitations provisions, and exceptions, to the statute of limitations provisions of the CCA. See MCL 600.6452(2).

The RJA contains no statutory notice period, and neither the Legislature nor our courts have ever had the occasion to consider whether the fraudulent concealment exception might apply to such a provision. The Legislature's failure to specifically address the application of the fraudulent concealment exception to the CCA's statutory notice period therefore cannot be presumed intentional under the above-mentioned rules of statutory construction. While "the Legislature is presumed to be aware of, and thus to have considered the effect [of a statutory enactment] on, all *existing* statutes," *GMAC LLC*, 286 Mich App at 372 (emphasis added), it makes no sense to presume knowledge of a potential future conflict without a context in which such knowledge would arise. Indeed, it would make as much sense to presume that the Legislature did not consider the issue of whether the fraudulent concealment exception would apply to the statutory notice provision of the CCA because, had it done so, it would have made its determination explicit. The Legislature's omission here does not provide dispositive evidence of intent, and we therefore must proceed according to the well-established rules of statutory interpretation and construction.

"The primary goal of judicial interpretation of statutes is to ascertain and give effect to the intent of the Legislature." *Dawson v Secretary of State*, 274 Mich App 723, 729; 739 NW2d 339 (2007). "This Court begins by reviewing the language of the statute, and, if the language is clear and unambiguous, it is presumed that the Legislature intended the meaning expressed in the statute." *McCormick v Carrier*, 487 Mich 180, 191; 795 NW2d 517 (2010). In such cases, "judicial construction is neither required nor permitted." *Solution Source, Inc v LPR Assoc Ltd Partnership*, 252 Mich App 368, 373; 652 NW2d 474 (2002). "However, if reasonable minds can differ concerning the meaning of a statute, judicial construction of the statute is appropriate." *Id*.

We conclude that reasonable minds could differ regarding the meaning of MCL 600.5855 as applied in the context of claims brought under the CCA. First, it must be noted that while MCL 600.5855, a subsection of Chapter 58 of the RJA, is part of the Legislature's statutory scheme for statutory limitations periods, the statutory language does not otherwise express or imply that its exception operates only by tolling only the limitations period. To the contrary, the plain language of the statute provides that an action that has been fraudulently concealed "may be commenced at any time within 2 years after the person who is entitled to bring the action

-15-

discovers, or should have discovered, the existence of the claim. . . ." MCL 600.5855. The statute's direction that such an action may proceed notwithstanding that "the action would otherwise be barred by the period of limitations," does not specifically *limit* the exception's application to those claims barred by the expiration of the limitations period. Considering only the plain language of MCL 600.5855, reasonable minds could differ on the question of whether the provision, as imported into the CCA, is intended to grant a claimant whose claim has been fraudulently concealed an affirmative right to bring suit within two years of discovery, regardless of prior noncompliance with the statutory requirements, or if the exception applies only to toll the statutory limitations period.

The language of MCL 600.5855 becomes more ambiguous when it is practically applied in the context of a claim brought under the CCA. Although MCL 600.5855 clearly permits the commencement of an action within two years after a claimant discovers or should have discovered a fraudulently concealed claim, the statutory notice period of MCL 600.6431 prohibits the commencement of an action without notice filed within six months or one year of the date on which the claim accrued. As previously discussed, the discovery doctrine has been abrogated in this state, see *Trentadue*, 479 Mich at 391-392, and a claim accrues on the date a claimant is harmed, regardless of when the claimant first learns of his harm. If MCL 600.6431 is strictly applied, as it must be, see *McCahan*, 492 Mich at 746-747, it is impossible to reconcile with the Legislature's clear intent to provide claimants with two years from the date of discovery to bring suit on a harm that the liable party has fraudulently concealed.[10]

"Statutory provisions are not to be read in isolation; rather, context matters, and thus statutory provisions are to be read as a whole." *Robinson v Lansing*, 486 Mich 1, 16; 782 NW2d 171 (2010). The Legislature clearly intended to incorporate the statutory limitations periods and exceptions, including the fraudulent concealment exception of MCL 600.5855, into the CCA. See MCL 600.6452(2). If the fraudulent concealment exception is not applied equally to the statutory period of limitations and the statutory notice period of the CCA, it cannot be applied at all. See *Apsey v Mem Hosp*, 477 Mich 120, 131; 730 NW2d 695 ("A statute is rendered nugatory when an interpretation fails to give it meaning or effect."). "[C]ourts must interpret statutes in a way that gives effect to every word, phrase, and clause in a statute and avoid an interpretation that would render any part of the statute surplusage or nugatory." *O'Connell v Director of Elections*, 316 Mich App 91, 98; 891 NW2d 240 (2016). Further, when there is "tension, or even conflict, between sections of a statute," this Court has a "duty to, if reasonably possible, construe them both so as to give meaning to each; that is, to harmonize them." *Nowell*

---

[10] We reject defendants' contention that to find a conflict between MCL 600.5855 and MCL 600.6431 one must "wrongly assume[] that a notice of intent is the same as a legal complaint." It is true that a claimant requires only minimal information to file a notice of intent, and that the knowledge required distinguishes a notice of intent from a legal complaint. However, a claimant that can satisfy the fraudulent concealment exception will have *no* knowledge of his potential claim prior to the date he discovers or should reasonably be expected to discover it. It is simply nonsensical to argue that a claimant may satisfy the notice requirement and still claim the benefit of the fraudulent concealment tolling provision.

*v Titan Ins Co*, 466 Mich 478, 483; 648 NW2d 157 (2002). Here, to read MCL 600.5855, as imported into the CCA, and MCL 600.6431 in harmony requires the conclusion that when the fraudulent concealment exception applies, it operates to toll the statutory notice period as well as the statutory limitations period.

Importantly, application of the fraudulent concealment exception to statutory notice periods does nothing to undermine the purpose for requiring timely statutory notice. As defendants concede, the purpose of the notice provision in MCL 600.6431 is to establish a "clear procedure" for pursuing a claim against the state and eliminate "ambiguity" about whether a claim will be filed. *McCahan*, 492 Mich at 744 n 24. The provision gives the state and its agencies time to create reserves and reduces the uncertainty of the extent of future demands. *Rowland*, 477 Mich at 211-212. But when the state and its officers, having knowledge of an event giving rise to liability and anticipating the possibility that claims may be filed, actively conceal information in order to prevent a suit, the state suffers no "ambiguity" or surprise. In cases where the fraudulent concealment exception may be applied, the state possesses the necessary information and the object of the statutory notice requirement is self-executing. Application of the fraudulent concealment exception to the statutory notice requirement of the CCA is therefore consistent with both the legislative intent behind the exception itself and the purpose of the statutory notice period. In keeping with the principles of statutory construction and the Legislature's clear intent to permit the application of the fraudulent concealment exception to claims brought under the CCA, we hold that the fraudulent concealment exception applies, at least, to toll the statutory notice period commensurate with the tolling of the statute of limitations in situations where its requirements have been met.[11]

If plaintiffs can prove, as they have alleged, that defendants actively concealed the information necessary to support plaintiffs' cause of action so that plaintiffs could not, or should not, have known of the existence of the cause of action until a date less than six months prior to the date of their complaint, application of the fraudulent concealment exception will fully apply and plaintiffs should be permitted to proceed regardless of when their claim actually accrued. Whether plaintiffs can satisfy the exception is a question that involves disputed fact and is subject to further discovery. Summary disposition on this ground is therefore inappropriate.

---

[11] We recognize that this Court, in two unpublished opinions, has declined to import the fraudulent concealment provision into MCL 600.6431. See *Brewer v Central Michigan Univ Bd of Trustees*, unpublished opinion per curiam of the Court of Appeals, issued November 21, 2013 (Docket No. 312374); *Zelek v State of Michigan*, unpublished opinion per curiam of the Court of Appeals, issued October 16, 2012 (Docket No. 305191). These opinions are not binding on this Court, see MCR 7.215(C). Additionally, in both *Brewer* and *Zelek*, the panel's conclusion that the fraudulent concealment exception did not apply to toll the statutory notice period was reached without recognition that the Legislature specifically imported the fraudulent concealment exception into the statute of limitations provision of the CCA, or consideration of the practical conflict created when the fraudulent concealment exception is applied to the statutory limitations period without also being applied to the statutory notice period. Because both cases also involved strikingly dissimilar factual situations, we find them unpersuasive.

### III. JURISDICTION OVER CITY DEFENDANTS

Next, state defendants argue that argue that the Court of Claims erred when it found that it could exercise jurisdiction over claims brought against city defendants because emergency managers are considered "state officers" under the CCA.[12] We disagree.

"Jurisdiction is a court's power to act and its authority to hear and decide a case." *Riverview v Sibley Limestone*, 270 Mich App 627, 636; 716 NW2d 615 (2006). "The Court of Claims is created by statute and the scope of its subject-matter jurisdiction is explicit." *O'Connell*, 316 Mich App at 101 (quotation marks and citations omitted). "A challenge to the jurisdiction of the Court of Claims presents a statutory question that is reviewed de novo as a question of law." *Id*. at 97 (quotation marks and citation omitted).

With MCL 600.6419(1)(a), the Legislature endowed the Court of Claims with exclusive jurisdiction "[t]o hear and determine any claim or demand, statutory or constitutional . . . *against the state or any of its departments or officers* notwithstanding another law that confers jurisdiction of the case in the circuit court." (Emphasis added.) In the same statutory subsection, the Legislature specified that

> [a]s used in this section, "the state or any of its departments or officers" means this state or any state governing, legislative, or judicial body, department, commission, board, institution, arm, or agency of the state, or an officer, employee, or volunteer of this state or any governing, legislative, or judicial body, department, commission, board, institution, arm, or agency of this state, acting, or who reasonably believes that he or she is acting, within the scope of his or her authority while engaged in or discharging a government function in the course of his or her duties. [MCL 600.6419(7).]

The jurisdiction of the Court of Claims does not extend to local officials. *Doan v Kellogg Community College*, 80 Mich App 316, 320; 263 NW2d 357 (1977).

Whether an emergency manager falls within the definition of state "officer" provided in MCL 600.6419(7) is a question of statutory interpretation. When interpreting a statute, "[o]ur duty is to ascertain and effectuate the intent behind the statute . . . from the language used in it." *Attorney General v Flint City Council*, 269 Mich App 209, 211-212; 713 NW2d 782 (2005).

---

[12] In the lower court and in this Court on appeal, city defendants argue that in their official capacities as emergency managers, they were state officers subject to the jurisdiction of the Court of Claims under MCL 600.6149. However, state defendants argued below, and argue again on appeal, that the Court of Claims lacks subject-matter jurisdiction over plaintiffs' claims against Earley and Ambrose because neither city defendant, in his official capacity, was a state officer. Although neither party raises the issue of standing on appeal, we note that because an official capacity suit against city defendants is, for practical purposes, a suit against the state, *Carlton v Dep't of Corrections*, 215 Mich App 490, 500-501; 546 NW2d 671 (1996), state defendants have a significant interest in the outcome of plaintiffs' case.

"Undefined statutory terms must be given their plain and ordinary meanings, and it is proper to consult a dictionary for definitions." *Halloran v Bhan*, 470 Mich 572, 578; 683 NW2d 129 (2004). "When statutory language is unambiguous, we must presume that the Legislature intended the meaning it clearly expressed and further construction is neither required nor permitted." *Attorney General*, 269 Mich App at 213 (quotation marks and citation omitted).

State defendants acknowledge that the Michigan Supreme Court has determined that the question whether an official is a state officer in a particular circumstance is "governed by the purpose of the act or clause in connection with which it is employed." *Schobert v Inter-Co Drainage Bd of Tuscola, Sanilac & Lapeer Cos for White Creek No 2 Inter-Co Drain*, 342 Mich 270, 282; 69 NW2d 814 (1955). State defendants assert that it is PA 436, the statute creating and governing the office of an appointed emergency manager, that is the focus of this inquiry, and devote substantial portions of their appellate briefs to pulling a distinction from "state officers" out of the language of that Act. State defendants have either offered this Court a red herring or confused an otherwise straightforward determination. The question is not, as state defendants contend, whether the Legislature in passing PA 436 intended to make emergency managers state officials. While PA 436 and its characterization of emergency managers may be relevant in another context, the question presented here is one of jurisdiction, and it is the intent behind the Legislature's grant of jurisdiction to the Court of Claims, through MCL 600.6419 in particular, that must direct this Court's analysis. See *Spectrum Health Hosp v Farm Bureau Mut Ins Co of Mich*, 492 Mich 503, 521; 821 NW2d 117 (2012) ("[T]he first step of statutory interpretation is to review the language of the statute at issue, not that of another statute.") Thus, in determining whether claims against an emergency manager fall within the jurisdiction of the Court of Claims, we begin by examining the plain language of MCL 600.6419(7).

This Court need not, and in fact may not, look past the CCA for a definition of "state officer" as employed therein. "Where a statute supplies its own glossary, courts may not import any other interpretation but must apply the meaning of the terms as expressly defined." *People v Schultz*, 246 Mich App 695, 703; 635 NW2d 491 (2001), citing *Harder v Harder*, 176 Mich App 589, 591; 440 NW2d 53 (1989). The Legislature has provided a definition of the term, which includes "an officer, employee, or volunteer of this state or any governing, legislative, or judicial body, department, commission, board, institution, arm, or agency of this state, acting, or who reasonably believes that he or she is acting, within the scope of his or her authority while engaged in or discharging a government function in the course of his or her duties," and which state defendants have not bothered to address. Regardless of whether emergency managers might be considered "state officers" in any context outside of the CCA, city defendants clearly fall within the Act's own definition and, as intended, within the Court of Claims' jurisdiction.

There is no dispute that city defendants made the decision to switch the city of Flint's water supply to the Flint River while acting within the scope of their official authority and in the discharge of a government function. Further, there is no doubt that city defendants were acting, at all times relevant to plaintiffs' claims, as employees or officers of the State of Michigan and its agencies. As the Court of Claims observed,

> [a]n emergency manager is a creature of the Legislature with only the power and authority granted by statute. [*Kincaid*, 311 Mich App at 87.] An emergency manager is appointed by the governor following a determination by the governor

-19-

that a local government is in a state of financial emergency. MCL 141.1546(1)(b); MCL 141.1549(1). The emergency manager serves at the governor's pleasure. MCL 141.1515(5)(d); MCL 141.1549(3)(d); *Kincaid*, 311 Mich App at 88. The emergency manager can be removed by the governor or by the Legislature through the impeachment process. MCL 141.1549(3)(d) and (6)(a). The state provides the financial compensation for the emergency manager. MCL 141.1549(3)(e) and (f). All powers of the emergency manager are conferred by the Legislature. MCL 141.1549(4) and (5); MCL 141.1550—MCL 141.1559; *Kincaid*, 311 Mich App at 87. Those powers include powers not traditionally within the scope of those granted municipal corporations. See MCL 141.1552(1)(a) – (ee). The Legislature conditioned the exercise of some of those powers upon the approval of the governor or his or her designee or the state treasurer. MCL 141.1552(1)(f), (x), (z) and (3); MCL 141.1555(1). The Legislature has also subjected the emergency manager to various codes of conduct otherwise applicable only to public servants, public officers and state officers. MCL 141.1549(9). Through the various provisions within the act, the state charges the emergency manager with the general task of restoring fiscal stability to a local government placed in receivership—a task which protects and benefits both the state and the local municipality and its inhabitants. The emergency manager is statutorily obligated to create a financial and operating plan for the local government that furthers specific goals set by the state and to submit a copy of the plan to the state treasurer for the treasurer's "regular[] reexamin[ation]." MCL 141.1551(2). The emergency manager is also obligated to report to the top elected officials of this state and to the state treasurer his or her progress in restoring financial stability to the local government. MCL 141.1562(1) and (2). Under the totality of these circumstances, the core nature of the emergency manager may be characterized as an administrative officer of state government. [*Mays*, unpub op of the Court of Claims, at 15-16, quoting *Collins v City of Flint*, unpublished opinion of the Court of Claims, issued August 25, 2016 (Docket No. 16-000115-MZ), pp 13-14.][13]

We agree that the totality of the circumstances indicate that an emergency manager operates as an administrative officer of the state.[14] Further, it is beyond dispute that at a

---

[13] Neither the Court of Claims opinion in this case nor the quoted opinion is binding on this Court. However, we adopt the court's accurate summary of the law as stated.

[14] State defendants argue that this Court should find persuasive a recent opinion, *Gulla v Snyder*, unpublished opinion of the Court of Claims, issued August 16, 2017 (Docket No. 16-000298-MZ), in which the Court of Claims judge concluded that emergency managers are not state officers for purposes of the CCA. This Court is not bound to follow the opinion of the Court of Claims, which directly conflicts with the Court of Claims opinion at issue here. Further, we note that the Court of Claims judge considering the issue in *Gulla* analyzed the issue according to the provisions of PA 436, rather than the jurisdictional provision of the CCA; an erroneous task this Court, as herein discussed, specifically disavows.

minimum, an emergency manager must be characterized as an employee of the state. Although the CCA does not provide a specific definition for "employee," this Court may look to dictionary definitions to "construe undefined statutory language according to common and approved usage." *In re Casey Estate*, 306 Mich App 252, 260; 856 NW2d 556 (2014). Black's Law Dictionary defines "employee" as "[s]omeone who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance." *Black's Law Dictionary* (10th ed). Emergency managers, who are appointed by the governor, serve at the governor's pleasure, are subject to review by the state treasurer, and operate only within the authority granted by the state government, easily fall within this definition. Indeed, our Court has recognized that political appointees, like emergency managers here, serve as at-will employees of the government agency that appointed them. See *James v City of Burton*, 221 Mich App 130, 133-134; 560 NW2d 668 (1997). An emergency manager, as an appointee of the state government, is an employee of the state government. Claims against an emergency manager acting in his or her official capacity therefore fall within the well-delineated subject-matter jurisdiction of the Court of Claims.

We note that if this Court were to accept state defendants' suggestion that the Court must consider whether PA 436 authorizes the Court of Claims to assume subject-matter jurisdiction over claims against emergency managers, the result would be the same. State defendants argue that PA 436 does not contemplate suits against emergency managers in the Court of Claims. However, while PA 436 does not expressly authorize suits against emergency managers in the Court of Claims, it specifically contemplates proceedings involving emergency managers in that court. Under PA 436, an emergency manager is granted the express authority to bring suits in the Court of Claims "to enforce compliance with any of his or her orders or any constitutional or legislative mandates, or to restrain violations of any constitutional or legislative power or his or her orders." MCL 141.1552(1)(q). This authorization acknowledges the status of an emergency manager as a state officer and is consistent with the CCA, which grants the Court of Claims jurisdiction over all claims brought by the "state or any of its departments or officers against any claimant." MCL 600.6419(1)(b).

Because city defendants' status as employees of the state during all times relevant to this appeal satisfies the jurisdictional question, we need not address state defendants challenge to the Court of Claims characterization of emergency managers as receivers for the state. However, we believe that the analogy is quite apt, and provides additional support for the conclusion that claims against an emergency manager fall within the subject-matter jurisdiction of the Court of Claims. Under PA 436,[15] the emergency managers' relationship with a municipality is specifically described as a "receivership." MCL 141.1542(q) (" 'Receivership' means the process under this act by which a financial emergency is addressed through the appointment of an emergency manager."). According to MCL 141.1549(2),

> Upon appointment, an emergency manager shall act for and in the place
> and stead of the governing body and the office of chief administrative officer of

---

[15] MCL 141.1541 *et seq*.

the local government. The emergency manager shall have broad powers *in receivership* to rectify the financial emergency and to assure the fiscal accountability of the local government and the local government's capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare. [Emphasis added.]

Additionally, the powers and responsibilities delegated to an emergency manager under PA 436 mirror those of an appointed receiver:

A receiver is sometimes said to be the arm of the court, *appointed to receive and preserve the property* of the parties to litigation and in some cases *to control and manage it* for the persons or party who may be ultimately entitled thereto. A receivership is primarily to preserve the property and not to dissipate or dispose of it. [*Westgate v Westgate*, 294 Mich 88, 91; 292 NW 569 (1940) (emphasis added).]

State defendants argue that emergency managers cannot be compared to court-appointed receivers because unlike court-appointed receivers emergency managers are appointed to represent the city rather than to act as neutral arbiters. State defendants mischaracterize the relationship between emergency managers and the municipalities whose finances they are appointed to oversee. In their appellate brief, city defendants aptly summarize the role of an appointed emergency manager:

The concept behind emergency management is that the State needs to appoint a neutral party to help eliminate a financial emergency because local officials have proven (in the State's view) unable to govern in a financially responsible way. An [emergency manager]'s job is to create and implement a financial plan that assures full payment to creditors while still conducting all aspects of a municipality's operations. Once the Governor agrees that the emergency has been sustainably resolved, power passes from the neutral receiver back to local officials.

City defendants' characterization of emergency managers as neutral overseers is supported by the provisions of PA 436. See MCL 141.1551(1)(a)-(b); MCL 141.1562(3); MCL 141.1543.

It has long been recognized that a receiver serves as the administrative arm or officer of the authority exercising the power of appointment. See *In re Guaranty Indemnity Co*, 256 Mich 671, 673; 240 NW 78 (1932) ("Generally speaking a receiver is not an agent, except of the court appointing him . . . He is merely a ministerial officer of the court, or, as he is sometimes called, the hand or arm of the court."); *Arbor Farms, LLC v GeoStar Corp*, 305 Mich App 374, 392-393; 853 NW2d 421 (2014) (noting that a receiver is both an officer and an administrative arm of the appointing court); *Hofmeister v Randall*, 124 Mich App 443, 445; 335 NW2d 65 (1983) (explaining that "a receiver is the arm of the court, appointed to receive and preserve the litigating parties' property"); *Cohen v Bologna*, 52 Mich App 149, 151; 216 NW2d 586 (1974) (explaining that a receiver "function[s] as officer of the court" that appointed him). Again, the definition of "the state or any of its departments or officers" for purposes of Court of Claims jurisdiction includes any "arm, or agency of the state," or any officer or employee of an "arm, or

agency of this state." MCL 600.6419(7). The Court of Claims did not err when it concluded that city defendants, in their official capacities as emergency managers, operated as arms of the state during all times relevant to the instant suit.

State defendants argue that the characterization of emergency managers as ministerial arms or officers of the state "directly contradicts" this Court's holding in *Kincaid*, 311 Mich App 76, where we concluded that an act of an emergency manager cannot be considered an act of the Governor. In *Kincaid*, the Court considered whether an emergency manager could exercise power textually granted to the Governor on a theory that an act of the emergency manager, as a gubernatorial appointee, was an act of the Governor himself. *Id.* at 87-88. This Court rejected the city's argument that an emergency manager acts on behalf of the Governor after considering the role of an emergency manager as described in PA 436. *Id.* at 88. Specifically, this Court held that PA 436 in no way authorized the Governor to delegate his or her authority to an emergency manager, who could act "only on behalf of numerous local officials" and whose "authority is limited to the local level." *Id.* State defendants argue that this holding precludes a finding that emergency managers are arms or agents of the state. However, state defendants divorce this Court's holding from its context. The issue in *Kincaid* was not whether an emergency manager is a state official subject to the subject-matter jurisdiction of the Court of Claims, but whether the range of power granted to an emergency manager includes the governor's power to ratify. While the *Kincaid* Court held that emergency managers do not inherit all of the powers of the governor, the Court did not hold that emergency managers cannot act as agents of the state. The fact that an emergency manager is not authorized to act *as* the Governor does not mean that an emergency manager is not authorized to act as an *agent* of the Governor.

More importantly, the *Kincaid* holding in no way precludes a finding that emergency managers are employees of the state subject to the jurisdiction of the Court of Claims under MCL 600.6419, regardless of whether they are also considered agents acting on behalf of the Governor. For these reasons, we hold that the Court of Claims did not err when it concluded that plaintiffs' claims against city defendants, sued in their official capacities as employees and administrative officers of the state, are within the subject-matter jurisdiction of the Court of Claims.

## IV. INJURY TO BODILY INTEGRITY

Next, defendants argue that the Court of Claims erred when it concluded that plaintiffs had pled facts that, if proved true, established a constitutional violation of plaintiffs' substantive due process right to bodily integrity for which a judicially inferred damages remedy is appropriate. We disagree.

Defendants moved for summary disposition of plaintiffs' injury to bodily integrity claims under MCR 2.116(C)(8). ). Summary disposition is proper under MCR 2.116(C)(8) if the opposing party has failed to state a claim on which relief can be granted. *Henry v Dow Chem Co*, 473 Mich 63, 71; 701 NW2d 684 (2005). "A motion for summary disposition under MCR 2.116(C)(8) tests the legal sufficiency of the complaint and allows consideration of only the pleadings." *MacDonald v PKT, Inc*, 464 Mich 322, 332; 628 NW2d 33 (2001). "For purposes of reviewing a motion for summary disposition under MCR 2.116(C)(8), all well-pleaded factual

-23-

allegations are accepted as true and construed in a light most favorable to the nonmovant." *Ernsting v Ave Maria College*, 274 Mich App 506, 509; 736 NW2d 574 (2007). A motion under MCR 2.116(C)(8) may only be granted "where the claims alleged are so clearly unenforceable as a matter of law that no factual development could possibly justify recovery." *Adair v Michigan*, 470 Mich 105, 119; 680 NW2d 386 (2004) quotation marks and citation omitted). This Court reviews constitutional questions de novo. *Travelers Ins Co v Detroit Edison Co*, 465 Mich 185, 205; 631 NW2d 733 (2001).

## A. GENERAL PRINCIPLES OF CONSTITUTIONAL TORTS

"Typically, a constitutional tort claim arises when a governmental employee, exercising discretionary powers, violates constitutional rights personal to a plaintiff." *Duncan v State*, 284 Mich App 246, 270; 774 NW2d 89 (2009), rev'd on other grounds 486 Mich 1071 (2010). The Michigan Supreme Court has held that "[a] claim for damages against the state arising from a violation by the state of the Michigan Constitution may be recognized in appropriate cases." *Smith*, 428 Mich at 544-546. "The first step in recognizing a damage remedy for injury consequent to a violation of our Michigan Constitution is, obviously, to establish the constitutional violation itself." *Marlin v Detroit (After Remand)*, 205 Mich App 335, 338; 517 NW2d 305 (1994) (quotation marks and citation omitted).

Following *Smith*, this Court held that to establish a violation of the Constitution a plaintiff must show that the state action at issue: (1) deprived the plaintiff of a substantive constitutional right, and (2) was executed pursuant to an official custom or policy. *Carlton*, 215 Mich App at 504, citing *Monell v New York City Dep't of Social Servs*, 436 US 658, 694; 98 S Ct 2018; 56 L Ed 2d 611 (1978). The Court further directed that "[t]he policy or custom must be the moving force behind the constitutional violation in order to establish liability." *Id*. at 505.

We note at the outset that the Court of Claims articulated the proper test before engaging in a thorough analysis of the viability of plaintiffs' constitutional tort claim for injury to bodily integrity. However, we must review the matter de novo, giving no deference to the lower court decision, in order to determine whether defendants were entitled to judgment as a matter of law. *Scalise v Boy Scouts of America*, 265 Mich App 1, 10; 692 NW2d 858 (2005). Thus, before we may decide whether it is appropriate to recognize a cause of action under the Due Process Clause of the Michigan Constitution for violation of plaintiffs' rights to bodily integrity, we must first determine whether plaintiffs have alleged facts that, if proved true, are sufficient to establish such a violation.

## B. SUBSTANTIVE RIGHT TO BODILY INTEGRITY

The Due Process Clause of the Michigan Constitution provides, in pertinent part, that "[n]o person shall . . . be deprived of life, liberty or property, without due process of law. . . ." Const 1963, art 1, § 17. "The due process guarantee of the Michigan Constitution is coextensive with its federal counterpart." *Grimes v Van Hook-Williams*, 302 Mich App 521, 530; 839 NW2d 237 (2013). "The doctrine of substantive due process protects unenumerated fundamental rights and liberties under the Due Process Clause of the Fourteenth Amendment." *Gallagher v City of Clayton*, 699 F3d 1013, 1017 (CA 8, 2012), citing *Washington v Glucksberg*, 521 US 702, 720; 117 S Ct 2258; 138 L Ed 2d 772 (1997).

"The substantive component of due process encompasses, among other things, an individual's right to bodily integrity free from unjustifiable government interference." *Lombardi v Whitman*, 485 F3d 73, 79 (CA 2, 2007); see *Glucksberg*, 521 US at 720 ("In a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the "liberty" specially protected by the Due Process Clause includes the right[] . . . to bodily integrity[.]"); *Alton v Texas A&M University*, 168 F3d 196, 199 (CA 5, 1999) ("[T]he right to be free of state-occasioned damage to a person's bodily integrity is protected by the fourteenth amendment guarantee of due process." (Quotation marks and citation omitted.)). As early as 1891, the United States Supreme Court recognized that "[n]o right is held more sacred, or is more carefully guarded . . . than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac R Co v Botsford*, 141 US 250, 251; 11 S Ct 1000, 1001; 35 L Ed 734 (1891). The Court has since recognized a liberty interest in bodily integrity in circumstances involving such things as abortions, *Roe v Wade*, 410 US 113; 93 S Ct 705; 35 L Ed 2d 147 (1973), end-of-life decisions, *Cruzan v Dir, Missouri Dep't of Health*, 497 US 261; 110 S Ct 2841; 111 L Ed 2d 224 (1990), birth control decisions, *Griswold v Connecticut*, 381 US 479; 85 S Ct 1678; 14 L Ed 2d 510 (1965), corporal punishment, *Ingraham v Wright*, 430 US 651, 672; 97 S Ct 1401; 51 L Ed 2d 711 (1977), and instances where individuals are subject to dangerous or invasive procedures where their personal liberty is being restrained, see, e.g., *Rochin v California*, 342 US 165; 72 S Ct 205; 96 L Ed 183 (1952) (determining that a detainee's bodily integrity was violated when police ordered doctors to pump his stomach to obtain evidence of drugs); *Screws v United States*, 325 US 91; 65 S Ct 1031; 89 L Ed 1495 (1945) (holding that an individual's bodily integrity was violated where a citizen was beaten to death while in police custody).

Violation of the right to bodily integrity involves "an egregious, nonconsensual entry into the body which was an exercise of power without any legitimate governmental objective." *Rogers v Little Rock, Arkansas*, 152 F3d 790, 797 (CA 8, 1998), citing *Co of Sacramento v Lewis*, 523 US 833; 118 S Ct 1708; 140 L Ed 2d 1043 (1998). Here, plaintiffs clearly allege a nonconsensual entry of contaminated and toxic water into their bodies as a direct result of defendants' decision to pump water from the Flint River into their homes and defendants' subsequent affirmative act of physically switching the water source. Furthermore, we can conceive of no legitimate governmental objective for this violation of plaintiffs' bodily integrity. Indeed, defendants have not even attempted to provide one. However, to survive dismissal, the alleged "violation of the right to bodily integrity must be so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Villanueva v City of Scottsbluff*, 779 F3d 507, 513 (CA 8, 2015) (quotation marks and citation omitted); see also *Mettler Walloon, LLC v Melrose Twp*, 281 Mich App 184, 198; 761 NW2d 293 (2008) (explaining that in the context of individual governmental actions or actors, to establish a substantive due process violation, "the governmental conduct must be so arbitrary and capricious as to shock the conscience.").

"Conduct that is merely negligent does not shock the conscience, but 'conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.' " *Villaneuva*, 779 F3d at 513, quoting *County of Sacramento v Lewis*, 523 US 833, 850; 118 S Ct 1708; 140 L Ed 2d 1043 (1998). At a minimum, proof of deliberate indifference is required. *McClendon v City of Columbia*, 305 F3d 314, 326 (CA 5, 2002). A state actor's failure to alleviate "a significant risk that he should have

-25-

perceived but did not," does not rise to the level of deliberate indifference. *Farmer v Brennan*, 511 US 825, 837; 114 S Ct 1970; 128 L Ed 2d 811 (1994). To act with deliberate indifference, a state actor must "know [] of and disregard[] an excessive risk to [the complainant's] health or safety." *Ewolski v City of Brunswick*, 287 F3d 492, 513 (CA 6, 2002), *quoting Farmer*, 511 US at 837. "The case law [] recognizes official conduct may be more egregious in circumstances allowing for deliberation . . . than in circumstances calling for quick decisions." *Williams v Berney*, 519 F3d 1216 (CA 10, 2008).

We agree with the Court of Claims' conclusion that "[s]uch conduct on the part of the state actors, and especially the allegedly intentional poisoning of the water users of Flint, if true, may be fairly characterized as being so outrageous as to be 'truly conscience shocking.' " *Mays*, unpub op at 28. Plaintiffs allege that defendants made the decision to switch the city of Flint's water source to the Flint River after a period of deliberation, despite knowledge of the hazardous properties of the water. Additionally, plaintiffs allege that defendants neglected to conduct any additional scientific assessments of the suitability of the Flint Water for use and consumption before making the switch, which was conducted with knowledge that Flint's water treatment system was inadequate. According to plaintiffs' complaint, various state actors intentionally concealed scientific data and made false assurances to the public regarding the safety of the Flint River water even after they had received information suggesting that the water supply directed to plaintiffs' homes was contaminated with Legionella bacteria and dangerously high levels of toxic lead. At the very least, plaintiffs' allegations are sufficient to support a finding of deliberate indifference on the part of the governmental actors involved here.

Plaintiffs have alleged facts sufficient to support a constitutional violation by defendants of plaintiffs' right to bodily integrity.[16] We therefore proceed to consider whether the deprivation of rights resulted from implantation of an official governmental custom or policy.

## C. OFFICIAL CUSTOM OR POLICY

"This Court has held that liability for a violation of the state constitution should be imposed on the state only where the state's liability would, but for the Eleventh Amendment,

---

[16] Defendants ask this Court to rely on an extrajurisdictional opinion, *Coshow v City of Escondido,* 132 Cal App 4th 687, 709-710; 34 Cal Rptr 3d 19 (2005), as support for the conclusion that plaintiffs' right to bodily integrity is not implicated in the context of public drinking water because the Due Process Clause does not guarantee a right to contaminant-free drinking water. While the California court noted that "the right to bodily integrity is not coextensive with the right to be free from the introduction of a contaminated substance in the public drinking water," *id*. at 709, it did not hold that the introduction of contaminated substances could never form the basis for an injury to bodily integrity claim. Additionally, this Court finds *Coshow* unpersuasive as factually dissimilar. The alleged "contaminant" in that case was fluoride, which is frequently introduced into water systems. *Coshow* did not address whether substantive due process protections might be implicated in the case of intentional introduction of known contaminants by governmental officials, and its reasoning is inapplicable here.

render it liable under the standard for local governments as set forth in 42 USC 1983 and articulated in [*Monell*]." *Reid v Michigan*, 239 Mich App 621, 628; 609 NW2d 215 (2000). Thus, the state and its officials will only be held liable for violation of the state constitution "in cases where a state 'custom or policy' mandated the official or employee's actions." *Carlton*, 215 Mich App at 505, quoting *Smith*, 428 Mich at 642 (BOYLE, J., concurring). Official governmental policy includes "the decisions of a government's lawmakers" and "the acts of its policymaking officials." *Johnson v VanderKooi*, 319 Mich App 589, ___; 903 NW2d 843 (2017). See also *Monell*, 436 US at 694 (stating that a government agency's custom or policy may be "made by its lawmakers or by those whose acts or edicts may fairly be said to represent official policy.") A "single decision" by a policymaker or governing body "unquestionably constitutes an act of official government policy," regardless of whether "that body had taken similar action in the past or intended to do so in the future." *Pembaur v Cincinnati*, 475 US 469, 480; 106 S Ct 1292; 89 L Ed 2d 452 (1986). In *Pembaur*, the United States Supreme Court explained:

> To be sure, "official policy" often refers to formal rules or understandings—often but not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time. That was the case in *Monell* itself, which involved a written rule requiring pregnant employees to take unpaid leaves of absence before such leaves were medically necessary. However . . . a government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations. If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government "policy" as that term is commonly understood. More importantly, where action is directed by those who establish governmental policy, the [government] is equally responsible whether that action is to be taken only once or to be taken repeatedly. [*Id*. at 480-481 (citations omitted).]

The Court clarified that not all decisions subject governmental officers to liability. *Id*. at 481. Rather, it is "where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id*. at 483.

The facts of this case as plaintiffs allege, if true, are sufficient to support the conclusion that their constitutional claim of injury to bodily integrity arose from actions taken by state actors pursuant to governmental policy. Plaintiffs allege that various aspects of Flint's participation in the KWA project and the interim plan to provide Flint residents with Flint River water during the transition were approved and implemented by the Governor, the State Treasurer, the emergency managers and other state officials, including officials employed by the DEQ. These allegations implicate state and city defendants, state officers and authorized decision-makers, in the adoption of particular courses of action that ultimately resulted in violations of plaintiffs' substantial rights. Likewise, as the Court of Claims observed,

> the alleged decisions of various state officials to defend the original decision to switch to using the Flint River as a water source, to resist a return to the Detroit water distribution system, to downplay and discredit accurate information

gathered by outside experts regarding lead in the water supply and elevated lead levels in the bloodstreams of Flint's children, and to continue to reassure the Flint water users that the water was safe and not contaminated with lead or Legionella bacteria, played a role in the alleged violation of plaintiffs' constitutional rights. [*Mays*, unpub op at 27.]

Plaintiffs allege a coordinated effort involving various state officials, including multiple high-level DEQ employees, to mislead the public in an attempt to cover up the harm caused by the water switch. If these allegations are proven true, they also support the conclusion that government actors, acting in their official roles as policymakers, considered a range of options and made a deliberate choice to orchestrate an effort to conceal the awful consequences of the water switch, likely exposing plaintiffs and other water users to unnecessary further harm. The allegations in plaintiffs' complaint are therefore sufficient to establish a violation of constitutional rights arising from the implementation of official policy.

## D.  AVAILABILITY OF DAMAGE REMEDY

Because plaintiffs' allegations, if proven true, are sufficient to sustain a claim for injury to bodily integrity, we must determine whether this case is one for which it is appropriate to recognize a damages remedy for the state's violation of art 1, § 17 of the Michigan Constitution. We conclude that this is such a case.

As our appellate courts have done, the Court of Claims correctly addressed the propriety of an inferred damages remedy under the multi-factor balancing test first articulated in a concurring opinion by Justice BOYLE in Smith, 428 Mich at 648 ) (BOYLE, J., concurring). See e.g., *Jones*, 462 Mich at 336-337; *Reid*, 239 Mich App at 628-629. To apply the test, we consider the weight of various factors including, as relevant here, (1) the existence and clarity of the constitutional violation itself, (2) the degree of specificity of the constitutional protection, (3) support for the propriety of a judicially inferred damage remedy in any "text, history, and previous interpretations of the specific provision," (4) "the availability of another remedy," and (5) "various other factors" militating for or against a judicially inferred damage remedy. See *Jones*, 462 Mich at 648-652 (BOYLE, J., concurring).

We have already determined that plaintiffs have set forth allegations to establish a clear violation of the Michigan Constitution.  Like the Court of Claims, we conclude that the first factor weighs in favor of a judicially inferred damages remedy.  However, Justice BOYLE rightly opined that the protections of the Due Process Clause are not as "clear cut" as specific protections found elsewhere in the Constitution. Michigan appellate courts have acknowledged that the substantive component of the federal Due Process Clause protects an individual's right to bodily integrity, see e.g., *Sierb*, 456 Mich at 527, 529; *Fortune v City of Detroit Pub Sch*, unpublished opinion per curiam of the Court of Appeals, issued October 12, 2004 (Docket No. 248306), p 2, but this Court is unaware of any Michigan appellate decision expressly recognizing the same protection under the Due Process Clause of the Michigan Constitution or a stand-alone constitutional tort for violation of the right to bodily integrity. Although our Due Process Clause is interpreted coextensively with the Due Process Clause of the United States Constitution, *Cummins v Robinson Twp*, 283 Mich App 667, 700-701; 770 NW2d 421 (2009), we do not believe that the federal courts' application and interpretation of the right to bodily integrity

provides an appropriate degree of claim specificity under our own prior jurisprudence. We therefore conclude that the second and third factors weigh slightly against recognition of a damages remedy for the injuries alleged.

In considering the fourth factor, "the availability of an alternate remedy," we note that we agree with the Court of Claims conclusion that the question posed is whether plaintiffs have any *available* alternate remedies against these specific defendants. See *Jones*, 462 Mich at 335-337 (contrasting claims against the state and state officials with claims against municipalities and individual municipal employees). Thus, the fact that plaintiffs might be pursuing causes of action in another court, at this stage of the proceedings, is largely irrelevant. We proceed to determine whether plaintiffs are presented with alternative avenues for pursuit of remedies for the violations alleged.

It seems clear that a judicially imposed damages remedy for the alleged constitutional violation is the only available avenue for obtaining *monetary* relief. A suit for monetary damages under 42 USC 1983 for violation of rights granted under the federal constitution or a federal statute cannot be maintained in any court against a state, a state agency, or a state official sued in his official capacity because the Eleventh Amendment affords the state and its agencies immunity from such liability. *Howlett v Rose*, 496 US 356, 365; 110 S Ct 2430; 110 L Ed 2d 332 (1990); *Bay Mills Indian Community v State of Michigan*, 244 Mich App 739, 749; 626 NW2d 169 (2001). The state and its officials also enjoy broad immunity from liability under state law. "[T]he elective or highest appointive executive official of all levels of government" is absolutely immune from "tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her . . . executive authority." MCL 691.1407(5).[17] It is undisputed that this applies to the Governor, *Duncan*, 284 Mich App at 271-272, and for the reasons articulated by the Court of Claims, we conclude that it also applies to city defendants for actions taken in their official roles as emergency managers, see *Mays*, unpub op at 37-40. Absent the application of a statutory exception, state agencies are also "immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function." MCL 691.1407(1); *Duncan*, 284 Mich App at 266-267. Governmental employees acting within the scope of their authority are immune from tort liability unless their actions constitute gross negligence, MCL 691.1407(2), and even if governmental employees are found liable for gross negligence, the state may not be held vicariously liable, *Malcolm v East Detroit*, 437 Mich 132; 468 NW2d 479 (1991). Further, there is no exception to governmental immunity for intentional torts committed by governmental employees exercising their governmental authority, *Genesee Co Drain Comm'r v Genesee Co*, 309 Mich App at 328, and governmental employers may not be held liable for the intentional tortious acts of their employees, *Payton v Detroit*, 211 Mich App 375, 393; 536 NW2d 233 (1995).

---

[17] MCL 141.1560(1) of the Local Financial Stability and Choice Act specifically grants emergency managers immunity from liability as provided in MCL 691.1407, which grants complete immunity to "the highest elective or appointive executive official of all levels of government."

We have already determined that plaintiffs' alleged constitutional violations occurred as a result of policy implementation by defendants in their official capacities. Like the Court of Claims, we hold that based on the aforementioned principles, 'the state, its agencies, and the Governor and former emergency managers acting in an official capacity, are not 'persons' under 42 USC 1983 and enjoy sovereign immunity under the Eleventh Amendment and statutory immunity under MCL 691.1407 from common law claims [and] plaintiffs have no alternative recourse to enforce their respective rights against them." *Mays*, unpub op at 442, citing *Jones*, 462 Mich at 335-337.

Defendants argue for the first time on appeal that plaintiffs constitutional tort claims, arising from plaintiffs' alleged exposure to toxic drinking water, may be vindicated under the federal safe drinking water act (SDWA), 42 USC 300f *et seq*., and the Michigan safe drinking water act (MSDWA), MCL 325.1001 *et seq*. Defendants do not cite specific provisions of the statutes to support their argument. Generally, this Court will not address issues that were not raised in or addressed by the trial court, *Northland Wheels Roller Skating Center, Inc v Detroit Free Press*, 213 Mich App 317, 330; 539 NW2d 774 (1995), or those that are insufficiently briefed, *Nat'l Waterworks, Inc v Int'l Fidelity & Surety, Ltd*, 275 Mich App 256, 265; 739 NW2d 121 (2007). However, we would note that while the SDWA contains a citizen-suit allowing for a private action against any person violating its terms, the statutory scheme provides for injunctive relief only. *Boler v Earley*, 865 F3d 391, 405-406 (CA 6, 2017), citing 42 USC 300j-8. The MSDWA, as defendants concede, does not contain a citizen-suit provision.

Contrary to defendants' assertion, the SDWA and its Michigan counterpart do not provide a legislative scheme for vindication of the constitutional violations alleged that would "militate against a judicially inferred damage remedy" under *Jones*, 462 Mich at 337. Indeed, in a related federal case, the Sixth Circuit Court of Appeals considered whether Congress intended for the SDWA to preclude remedies for constitutional violations, and concluded that it did not. *Boler*, 865 F3d at 409. The Court explained:

> Under some circumstances, actions that violate the SDWA may also violate the . . . Due Process Clause. The Defendants argue that this is necessarily the case, and that the Plaintiffs' [constitutional] claims could not be pursued without showing a violation of the SDWA. But as noted, that is often not the case, particularly where the SDWA does not even regulate a contaminant harmful to public drinking water users. The contours of the rights and protections of the SDWA and those arising under the Constitution, and a plaintiff's ability to show violations of each, are "not . . . wholly congruent." This further supports the conclusion that Congress did not intend to foreclose [constitutional claims under § 1983] by enacting the SDWA. [*Id*. (citation omitted).]

Additionally, neither the SDWA nor the MSDWA address the conduct at issue in this case, which includes knowing and intentional perpetuation of exposure to contaminated water, as well as fraudulent concealment of the hazardous consequences faced by individuals who used or consumed the water. These statutes therefore do not provide an alternative remedy for plaintiffs' claim of injury to bodily integrity.

We would here note that plaintiffs seek injunctive relief against several of the named defendants in a related federal court action. Plaintiffs' complaint in that action indicates that plaintiffs seek "prospective relief only" against the Governor and the state, but describes the equitable relief sought as an order "to remediate the harm caused by defendants [sic] unconstitutional conduct including repairs or [sic] property, [and] establishment of as [sic] medical monitoring fund . . . ." Plaintiffs also seek an award of compensatory and punitive damages. The "availability" of these remedies remains to be seen and, as previously noted, the fact that plaintiffs seek alternative remedies does not affect our decision regarding the *availability* of alternative remedies. We will not opine on the merits of plaintiffs' federal cause of action. However, we agree with the Court of Claims' observation that "[d]evelpments in that and other Flint Water Crisis litigation, including the extent to which any 'equitable' relief awarded may essentially equate to an award of monetary damages, may impact this Court's future conclusions both with regard to the availability of alternative remedies and other matters, including remedies, if any, that may be appropriate in this action." *Mays*, unpub op at 35.

Defendants argue that this fourth factor must be considered dispositive, and that the availability of any other remedy should foreclose the possibility of a judicially inferred damage remedy. Although the Supreme Court in *Jones*, 462 Mich at 337, stated that "*Smith* only recognized a narrow remedy against the state on the basis of the unavailability of any other remedy," we agree with the Court of Claims' conclusion that the *Jones* Court's use of the word "only" referenced the sentence that followed, distinguishing claims against the state and specifically limiting the Court's holding to cases involving a municipality or an individual defendant. *Mays*, unpub op at 32; see *Jones*, 462 Mich at 337. In *Smith*, Justice BOYLE described the availability of an alternative remedy only as a "special factor[] counseling hesitation, . . . which militate[s] against a judicially inferred damage remedy." *Smith*, 428 Mich at 647 (BOYLE, J., concurring). We therefore decline to hold that the availability of an alternative remedy acts as a complete bar to a judicially inferred damage remedy. However, given the cautionary nature of Justice BOYLE's language, we conclude that this factor, if satisfied, must be strongly weighted against the propriety of an inferred damages remedy.

Finally, we agree with the Court of Claims' conclusion that it is appropriate to give significant weight "to the degree of outrageousness of the state actor's conduct as alleged by plaintiffs." *Mays*, unpub op at 43. If plaintiffs' allegations are proven true, "various state actors allegedly intentionally concealed data and made false statements in an attempt to downplay the health dangers posed by using Flint's tap water, despite possessing scientific data and actual knowledge that the water supply reaching the taps of Flint water users was contaminated with Legionella bacteria and dangerously high levels of toxic lead." *Id*. We agree that the egregious nature of defendants' alleged constitutional violations weighs considerably in favor of recognizing a remedy.

Based on the totality if the circumstances presented, this Court holds that at this stage of the proceedings, it is appropriate to recognize a judicially inferred damage remedy for the injuries here alleged. Summary disposition of plaintiffs' injury to bodily integrity claim is therefore inappropriate.

# V. STATE-CREATED DANGER

On cross-appeal, plaintiffs argue that the Court of Claims erred when it granted defendants' motion for summary disposition of plaintiffs' constitutional claims under the state-created danger doctrine. We disagree.

This Court has never before considered whether a cause of action for state-created danger is cognizable under Michigan law. However, plaintiffs assert that this Court may recognize such a cause of action arising from "the broad protection of the Due Process Clause of the Michigan Constitution." The Due Process Clause of the Michigan Constitution commands that "[n]o person shall be . . . deprived of life, liberty or property, without due process of law[.]" Const 1963, art 1, § 17. This constitutional provision is nearly identical to the Due Process Clause of the United States Constitution, see US Const Am XIV, § 1, and "[t]he due process guarantee of the Michigan Constitution is coextensive with its federal counterpart." *Grimes*, 302 Mich App at 530. The substantive component of the due process guarantee " 'provides heightened protection against government interference with certain fundamental rights and liberty interests.' " *Id*. at 531, quoting *Glucksberg*, 521 US at 720. As the Court of Claims aptly explained, "[s]ubstantive due process protects the individual from arbitrary and abusive exercises of government power; certain fundamental rights cannot be infringed upon regardless of the fairness of the procedures used to implement them." *Mays*, unpub op at 20, citing *Sierb*, 456 Mich at 523. However, in general, "the due process clause does not require a state to protect its citizens' lives, liberty and property against invasion by private actors . . . [or] require a state to guarantee a minimum level of safety and security." *Markis v Grosse Pointe Park*, 180 Mich App 545, 554; 448 NW2d 352 (1989). Our Courts have been reluctant to broaden the protections of the Due Process Clause without Legislative guidance. *Sierb*, 456 Mich at 531-532; *Collins v Harker Heights*, 503 US 115, 125; 112 S Ct 1061; 117 L Ed 2d 261 (1992) (warning against expansion of "the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.").

Plaintiffs ask this Court to recognize and allow plaintiffs to pursue a cause of action under the so-called state-created danger theory, first recognized by the United States Supreme Court in *DeShaney v Winnebago Co Dep't of Social Services*, 489 US 189; 109 S Ct 998; 103 L Ed 2d 249 (1989). As the Court of Claims noted, "the very name of the theory, i.e. state-created danger, facially suggests that it could implicate what happened in Flint[.]" However, the moniker "state-created danger" is somewhat misleading. The doctrine has been applied in all contexts as a narrow exception to the general rule that while the state may be held liable under the Due Process Clause for its own actions, the state has no affirmative obligation to protect people from *each other*. In *DeShaney*, the Court considered whether a minor who had been beaten by his father had been deprived of a due process liberty interest by state social workers who failed to remove the minor from his father's custody despite receiving complaints of abuse. *Id*. at 191. After noting that the Due Process Clause of the United States Constitution imposes no affirmative duty on the state to protect individuals from private violence, the Court recognized a necessary exception to this general rule in cases where the state has undertaken some responsibility for an individual's care and wellbeing, or deprived an individual of the freedom to care for himself:

[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf. *In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf— through incarceration, institutionalization, or other similar restraint of personal liberty—which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.* [*Id*. at 199-201 (citations omitted; emphasis added).]

The Court explained that it is only in "certain limited circumstances [that] the Constitution imposes on the State affirmative duties of care and protection with respect to particular individuals" acting other than on behalf of the state. *Id*. at 198. Applying the foregoing principles to the facts in that case, the *DeShaney* Court found no due process violation by the state because the minor's injuries were sustained while he was in his father's custody, rather than in the custody of the state, and the danger of abuse had not been made greater by any affirmative action of the state. *Id*. at 201.

Although the United States Supreme Court did not explicitly adopt a cause of action for "state-created danger," various Federal appellate courts have relied on the Court's language to support a constitutional claim for state-created danger under 42 USC 1983 and the Due Process Clause of the United States Constitution. *McClendon*, 305 F3d at 330 (acknowledging that various federal circuit courts have "found a denial of due process when the state created the . . . dangers faced by an individual") (quotation marks and citation omitted); See also *TD v Patton*, 868 F3d 1209, 1221-1222 (CA 10, 2017); *Kennedy v Ridgefield*, 439 F3d 1055, 1061-1062 (CA 9, 2006); *Bright v Westmoreland Co*, 443 F3d 276, 280-282 (CA 3, 2006); *Pena v DePrisco*, 432 F 3d 98, 108-109 (CA 2, 2005); *Gregory v City of Rogers, Arkansas*, 974 F2d 1006, 1009-1010 (CA 8, 1992); but see *Doe v Columbia-Brazoria Independent Sch Dist*, 855 F3d 681, 688-689 (CA 5, 2017) (noting that a "state-created danger" exception has not yet been recognized in the Fifth Circuit).

According to the principles announced by the United States Supreme Court in *DeShaney*, the state-created danger exception applies in situations where an individual in the physical custody of the state, by incarceration or institutionalization or some similar restraint of liberty, suffers harm from third-party violence resulting from an affirmative action of the state to create or make the individual more vulnerable to a danger of violence. So the state-created danger theory arose, and so it has been consistently applied. Although the elements of a state-created danger cause of action vary slightly between federal circuits, courts consistently require some

third-party, nongovernmental harm, either facilitated by or made more likely by an affirmative action of the state. See, e.g., *Patton*, 868 F3d at 1221-1222 (recognizing a constitutional violation when a "state actor affirmatively act[s] to create or increase[] a plaintiffs' vulnerability to danger from private violence"); *Gray v Univ of Colorado Hosp Authority*, 672 F3d 909, 921 (CA 10, 2012) (describing the state-created danger theory as a "narrow exception, which applies only when a state actor affirmatively acts to create, or increase[] a plaintiff's vulnerability to, danger from private violence."); *Kneipp v Tedder*, 95 F3d 1199, 1203 (CA 3, 1996) (noting that a "third party's crime" is an element common to "cases predicating constitutional liability on a state-created danger theory."). Indeed, most federal appellate courts have adopted a test substantially similar to the one employed by the Sixth Circuit Court of Appeals, which enumerates the elements of a state-created danger cause of action as follows:

> To show a state-created danger, plaintiff must show: 1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; 2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and 3) the state knew or should have known that its actions specifically endangered the plaintiff. [*Cartwright v City of Marine City*, 336 F3d 487, 493 (CA 6, 2003).]

Additionally, the Michigan Court of Appeals has applied the test articulated by the Sixth Circuit to claims brought under 42 USC 1983. See *Manuel v Gill*, 270 Mich App 355, 365-366; 716 NW2d 291 (2006), aff'd in part and rev'd in part 481 Mich 637 (2008); *Dean v Childs*, 262 Mich App 48, 54-57; 684 NW2d 894 (2004), rev'd in part on other grounds 474 Mich 914 (2005).

As previously discussed, the "first step in recognizing a damage remedy for injury consequent to a violation of our Michigan Constitution is . . . to establish the constitutional violation itself." *Marlin*, 205 Mich App at 338 (quotation marks and citation omitted). Here, defendants argue that plaintiffs' state-created danger cause of action cannot be sustained because plaintiffs have not alleged any actions by defendants that "created or increased the risk that plaintiff[s] would be exposed to an act of violence by a third party." We agree. While plaintiffs suggest that harm committed by a third party is not a necessary element of a cause of action for state-created danger, no court that has recognized or applied the state-created danger theory has done so in the absence of some act of private, nongovernmental harm. Indeed, plaintiffs acknowledge that, at least, the harm necessary to sustain a constitutional tort claim of state-created danger must spring from a source other than a state actor. Were this Court to recognize a cause of action for state-created danger arising from the Michigan Constitution, it would be narrow in scope and so limited.

In this case, plaintiffs have alleged harms caused directly and intentionally by state actors. This is simply not the sort of factual situation in which a claim for state-created danger, according to its common conception, may be recognized. The Court of Claims did not err when it concluded that, even if a state-created danger cause of action is cognizable under Michigan law, plaintiffs have not alleged facts to support it. Summary disposition in favor of all defendants on plaintiffs' state-created danger claim is therefore appropriate.

## VI. INVERSE CONDEMNATION

-34-

Next, defendants argue that the Court of Claims erred in denying their motion for summary disposition of plaintiffs' inverse condemnation claims. We disagree.

"Both the United States and Michigan constitutions prohibit the taking of private property for public use without just compensation." *Wiggins v City of Burton*, 291 Mich App 532, 571; 805 NW2d 517 (2011), citing US Const Am V; Const 1963, art 10, § 2. "A de facto taking occurs when a governmental agency effectively takes private property without a formal condemnation proceeding." *Merkur Steel Supply Inc v Detroit*, 261 Mich App 116, 125; 680 NW2d 485 (2004). Inverse condemnation is " 'a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency.' " *In re Acquisition of Land-Virginia Park*, 121 Mich App 153, 158-159; 328 NW2d 602 (1982). "Inverse condemnation can occur without a physical taking of the property; a diminution in the value of the property or a partial destruction can constitute a 'taking.' " *Merkur Steel Supply Inc*, 261 Mich App at 125. Further,

> [a]ny injury to the property of an individual which deprives the owner of the ordinary use of it is equivalent to a taking, and entitles him to compensation. So a partial destruction or diminution of value of property by an act of government, which directly and not merely incidentally affects it, is to that extent an appropriation. [*Peterman v Dep't of Natural Resources*, 446 Mich 177, 190; 521 NW2d 499 (1994) (quotation marks and citation omitted).]

"While there is no exact formula to establish a de facto taking, there must be some action by the government specifically directed toward the plaintiff's property that has the effect of limiting the use of the property." *Dorman v Clinton Twp*, 269 Mich App 638, 645; 714 NW2d 350 (2006) (quotation marks and citation omitted). "[A] plaintiff alleging inverse condemnation must prove a causal connection between the government's actions and the alleged damages." *Hinojosa v Dep't of Natural Resources*, 263 Mich App 537, 548; 688 NW2d 550 (2010).

Stated simply, "a plaintiff alleging a de facto taking or inverse condemnation must establish (1) that the government's actions were a substantial cause of the decline of the property's value and (2) that the government abused its powers in affirmative actions directly aimed at the property." *Blue Harvest, Inc v Dep't of Transp*, 288 Mich App 267, 277; 792 NW2d 798 (2010). Further, "[t]he right to just compensation, in the context of an inverse condemnation suit for diminution in value . . . exists only where the land owner can allege a unique or special injury, that is, an injury that is different in kind, not simply in degree, from the harm suffered by all persons similarly situated." *Spiek v Mich Dep't of Transp*, 456 Mich 331, 348; 572 NW2d 201 (1998).

Plaintiffs allege that defendants made the decision to switch the city of Flint's water source from Lake Huron to the Flint River despite knowledge of the Flint River's toxic potential and the inadequacy of Flint's water treatment plant. Plaintiffs also allege that immediately after the switch was effected, toxic water flowed directly from the Flint River, through the city's service lines to the water plant and then to plaintiffs' properties, where it caused physical damage to plumbing, water heaters, and service lines, leaving the infrastructure unsafe to use even after the delivery of toxic water was halted by the city's reconnection to the DWSD. According to

plaintiffs, this damage resulted in reduced property values. Additionally, plaintiffs allege that various state actors concealed or misrepresented data, and made false statements about the safety of Flint River water in an attempt to downplay the risk of its use and consumption. We agree with the Court of Claims' conclusion that "[t]he allegations are sufficient, if proven, to allow a conclusion that the state actors' actions were a substantial cause of the decline of the property's value and that the state abused its powers through affirmative actions directly aimed at the property, i.e., continuing to supply each water user with corrosive and contaminated water with knowledge of the adverse consequences associated with being supplied with such water."

Disputing the conclusion reached by the Court of Claims, defendants take specific issue with each element of plaintiffs' inverse condemnation claim. First, defendants argue that plaintiffs have not alleged any affirmative action to support a claim of inverse condemnation because a failure to license, regulate, or supervise cannot be considered an affirmative act. It is true that "alleged misfeasance in licensing and supervising" does not constitute an affirmative action to support a claim for inverse condemnation. *Attorney General v Ankersen*, 148 Mich App 524, 562; 385 NW2d 658 (1986). However, plaintiffs have not alleged any failure to regulate or supervise, but an affirmative act of switching the water source with knowledge that such a decision could result in substantial harm. Defendants' argument in this regard is unsupported, and we therefore reject it. Further, state defendants attempt to avoid responsibility for the action of switching Flint's water source by arguing that city defendants alone made the decision and effectuated the switch. This argument, too, is unsupported. Plaintiffs have alleged both knowledge and action on the part of state defendants, and while it may ultimately be discovered that state defendants were not responsible for the injury suffered by plaintiffs, this Court here considers only the propriety of judgment as a matter of law and must therefore accept all of plaintiffs' well-pleaded allegations as true.

Defendants also argue that plaintiffs have not alleged that any actions taken by defendants were directly aimed at plaintiffs' property. Defendants compare the act of changing Flint's water supply to the city's affirmative act of removing adjacent residential neighborhoods and diminishing commercial owners' property values in *Murphy v Detroit*, 201 Mich App 54, 56; 506 NW2d 5 (1993). In that case, this Court held that no inverse condemnation had occurred because while the city's actions had affected the value of the plaintiffs' commercial property, the city had taken no deliberate action toward the commercial property that deprived the owners of their right to use the property as they saw fit. *Id*. According to defendants, the city's act of demolishing residential neighborhoods, as described in *Murphy*, represents a more egregious allegation of inverse condemnation than that leveled by plaintiffs here. As in *Murphy*, defendants argue, the government's actions merely *affected* plaintiffs' property.

Defendants' reliance on *Murphy* is misplaced. This is not a situation where plaintiffs have alleged an incidental reduction in property value resulting from some unrelated administrative action by the government. Here, plaintiffs allege deliberate actions taken by defendants that directly led to toxic water being delivered through Flint's own water delivery system *directly into* plaintiffs' water heaters, bathtubs, sinks, and drinking glasses, causing actual, physical damage to plaintiffs' property and affecting plaintiffs' property rights.

Finally, defendants argue that plaintiffs have not alleged a unique injury, different in kind from harm suffered by all persons similarly situated. According to defendants, plaintiffs' injury,

while perhaps different in degree, is no different from the harm suffered by all property owners exposed to Flint River water during the switch. Although defendants argue that plaintiffs' injuries should be compared only to those suffered by other users of Flint River water, defendants have cited no direct authority for this assertion and, indeed, the assertion is not logically supported by the case law on which defendants rely.

In *Richards v Washington Terminal Co*, 233 US 546; 34 S Ct 654; 58 L Ed 1088 (1914), an opinion that state defendants argue supports their position, the United States Supreme Court held that the plaintiffs, residents situated near a railroad tunnel, could not state a claim of inverse condemnation for cracks in their homes caused by vibrations from nearby trains because risk of such harm, while varying in degree, is shared generally by anyone living near a train. *Id*. at 554. However, as defendants acknowledge, the Court held that the plaintiffs could state a claim for inverse condemnation for damage caused by a fanning system within the tunnel that blew smoke and gases into their homes because this particular harm was suffered uniquely by the plaintiffs. *Id*. at 556. On review, we conclude that the *Richards* holding actually supports plaintiffs' contention that the harm alleged should be compared to harm suffered by all other municipal water users, rather than to all other Flint water users. In *Richards*, the Court did not compare the plaintiffs with all owners of property near a *specific* train, but with all property owners, in general, who own property near *any* train.

Similarly, in *Spiek*, 456 Mich at 333-335, the plaintiffs, who were owners of residential property, alleged entitlement to compensation for damages caused to their property from dust, vibration, and fumes emanating from a newly-constructed interstate expressway. The Michigan Supreme Court rejected the plaintiffs' claim because the damage to plaintiffs' property was no different than those "incurred by all property owners who reside adjacent to freeways or other busy highways." *Id*. at 332. In *Spiek*, as in *Richards*, the Court compared the plaintiffs to all similarly situated property owners, not just the owners of residential property adjacent to the newly-constructed expressway at issue in that case.

It follows, therefore, that plaintiffs' injury must be compared to harm suffered by municipal water users generally, rather than to harm suffered by other users of Flint River water. As in *Richards* and *Spiek*, plaintiffs have alleged injuries unique among similarly situated individuals, i.e. municipal water users, caused directly by governmental actions that resulted in exposure of their property to specific harm.

Defendants also suggest that because they have taken no affirmative action directly aimed at plaintiffs' property, they cannot possibly have caused plaintiffs' injuries. However, defendants' argument rests on assumptions that this Court, for the reasons discussed, declines to accept. Questions of fact still exist that, if resolved in plaintiffs' favor, support each element of plaintiffs' inverse condemnation claim. The Court of Claims therefore did not err when it concluded that summary disposition pursuant to MCR 2.116(C)(8) was, at this stage of the proceedings, inappropriate.

## VII. OFFICIAL CAPACITY CLAIMS

Finally, defendants argue that the Court of Claims erred in allowing plaintiffs to proceed with "official capacity" claims against the Governor and defendant emergency managers. Again, we disagree.

Defendants argued in the lower court that "official capacity" suits against governmental officials for constitutional violations are not recognized in Michigan and, as a matter of law, plaintiffs could not assert their constitutional tort claims against the Governor, Earley, or Ambrose. After considering defendants' argument, the Court of Claims concluded that the relevant case law did not preclude a nominal "official capacity" constitutional tort claim against these defendants. Because this is a question of law, this Court's review is de novo. *Jude v Heselschwerdt*, 228 Mich App 667, 670; 578 NW2d 704 (1998).

As previously discussed, the Michigan Supreme Court held in *Smith* that "[a] claim for damages against the state arising from violations by the state of the Michigan Constitution may be recognized in appropriate cases." *Smith*, 428 Mich at 544. The *Jones* Court noted that "*Smith* only recognized a narrow remedy against the state on the basis of the unavailability of any other remedy," and continued, explaining that "[t]hose concerns are inapplicable in actions against a municipality or an individual defendant. Unlike states and state officials sued in an official capacity, municipalities are not protected by the Eleventh Amendment." *Id*.

State defendants argue that with the above-cited language, the *Jones* Court acknowledged that state officials have the same immunity from suit under the Eleventh Amendment that the state has when they are sued in their "official capacity;" a legal "fiction" designed only "to promote the vindication of federal rights." Because the Eleventh Amendment does not apply in state courts, argue state defendants, the term "official capacity," as employed by the *Jones* Court, has no parallel meaning under Michigan law.

State defendants misread *Jones*. We agree with the Court of Claims' observation that the *Jones* Court's use of the term "only" derived from the fact that it was addressing claims against municipalities and individual municipal employees, as distinguished from claims against the state or individual state officials who are afforded protection by the Eleventh Amendment. *Mays*, unpub op at 32. The *Jones* Court's conclusions do not preclude a constitutional tort claim against individuals. Rather, the *Jones* Court specifically contemplated the availability of official capacity suits and was careful to evaluate the availability of alternative remedies against municipalities and municipal employees as "[u]nlike states and state officials sued in an official capacity." *Jones*, 462 Mich at 337. The Court of Claims correctly observed that "a proper reading of the pertinent case law compels the conclusion that the remedy allowed in *Smith*, while narrow, extends beyond the state itself to also reach state officials acting in their official capacities." *Mays*, unpub op at 32. Indeed, the *Jones* Court affirmed an opinion by the Court of Appeals which made even more clear that "the *Smith* rationale simply does not apply outside the context of a claim that the state (or a state official sued in an official capacity) has violated individual rights protected under the Michigan Constitution." *Jones*, 227 Mich App at 675.

We are also unconvinced by state defendants' argument that Michigan's statutes governing governmental liability distinguish between government agencies and government

officials and do not contemplate an "official capacity" suit. Michigan courts have long recognized suits against state officials in their official capacities for claims arising outside of federal law. See, e.g. *Bay Mills Indian Community v State*, 244 Mich App 739, 748-749; 626 NW2d 169 (2001); *Jones v Sherman*, 243 Mich App 611, 612-613; 625 NW2d 391 (2000); *Carlton*, 215 Mich App at 500-501; *Lowery v Dep't of Corrections*, 146 Mich App 342, 348-349; 380 NW2d 99 (1985); *Abbott v Secretary of State*, 67 Mich App 344, 348; 240 NW2d 800 (1976). And Michigan law does, in fact, contemplate "official capacity" suits against government officials. Indeed, the very provisions of the CCA state defendants rely on to argue that emergency managers are not state officers expressly contemplate suits against "an officer, employee, or volunteer of this state . . . acting, or who reasonably believes that he or she is acting" in his or her official capacity. MCL 600.6419(7).

Contrary to state defendants' assertions, nothing in the provisions of our state's governmental liability statutes[18] precludes an "official capacity" suit, particularly one predicated on allegations of constitutional violations. The governmental immunity statutes do not apply where, as here, a plaintiff has alleged violations of the Michigan Constitution. *Smith*, 428 Mich at 544 (""Where it is alleged that the state, by virtue of custom or policy, has violated a right conferred by the Michigan Constitution, governmental immunity is not available in a state court action.") The fact that no statute specifically authorizes a suit against the Governor in his official capacity is irrelevant for the same reason. The liability of the state and its officers for constitutional torts is not something the state must affirmatively grant via statute;

> Under *Smith*, [a state] defendant cannot claim immunity where the plaintiff alleges that defendant has violated its own constitution. Constitutional rights serve to restrict government conduct. These rights would never serve this purpose if the state could use governmental immunity to avoid constitutional restrictions. [*Burdette*, 166 Mich App at 480-409.]

Liability of the state and its officers for constitutional torts is simply inherent in the fact that the Constitution binds even the state government as the preeminent law of the land.

Plaintiffs have sued Governor Snyder and emergency managers Earley and Ambrose in their official capacities only, rather than as individual government employees. As the Court of Claims noted, "a suit against a state official in his or her official capacity is not a suit against the

---

[18] State defendants instruct this Court to "see" MCL 691.1407(1), MCL 691.1407(2), and MCL 691.1407(5), provisions of the GTLA, but provide nothing in the way of argument supporting their conclusory assertion the GTLA "in no way contemplate[s] an 'official capacity' claim." "It is not sufficient for a party simply to announce a position . . . and then leave it up to this Court to discover and rationalize the basis for his claims or unravel and elaborate for him his arguments[.]" *Wilson v Taylor*, 457 Mich 232, 243; 577 NW2d 100 (1998) (quotation marks and citation omitted). In any case, state defendants' argument that the GTLA precludes official capacity suits is belied by an immediately adjacent provision of the GTLA, which specifically contemplates causes of action "against an officer, employee, or volunteer of a governmental agency for injuries to persons or property." MCL 691.1408(1).

official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself." *Will v Mich Dep't of State Police*, 491 US 58; 109 S Ct 2304; 105 L Ed 2d 45 (1989); see also *McDowell v Warden of Mich Reformatory at Ionia*, 169 Mich 332, 336; 135 NW 265 (1912).  In other words, if they are successful in their causes of action against the Governor, Earley, or Ambrose, plaintiffs must look to recover monetary damages from the state.  Plaintiffs' official capacity suits cannot result in individual liability.  As the Court of Claims carefully noted, the Governor, Earley, and Ambrose are merely nominal party defendants, "such that the state and the state alone . . . [is] accountable for any damage award that may result in this action." *Mays*, unpub op at 33-34.

Official capacity suits are not merely redundant, as city defendants suggest.  Rather, official capacity suits, while directed at the state, facilitate an efficient and expedient judicial process.  In order to prevail on a constitutional violation claim against the state, plaintiffs are required to prove that the violation of their rights occurred by virtue of a state custom or policy that governmental actors carried out in the exercise of their official authority.  Plaintiffs have leveled specific allegations against the Governor, Earley, and Ambrose, and these defendants' participation in the judicial process is required.  It is logical, if not necessary, to name the policy-makers as nominal defendants in this case.  Should plaintiffs' case be tried before a jury, a clear distinction between plaintiffs' allegations against the state as a party, and against the Governor, Earley, and Ambrose in their official capacities, will aid the jury in understanding the precise issues involved and prevent unnecessary confusion.  Given our courts' history of recognizing "official capacity" suits, and the Court of Claims care in explaining that these suits are nominal only, we conclude that the Court of Claims did not err in allowing plaintiffs' "official capacity" suits against the Governor and city defendants to proceed.

VIII.  CONCLUSION

In sum, we hold that the Court of Claims did not err when it denied defendants' motion for summary disposition of plaintiffs' constitutional injury to bodily integrity and inverse condemnation claims.  Questions of fact remain that, if resolved in plaintiffs' favor, could establish each of these claims and plaintiffs' compliance with, or relief from, the statutory notice requirements of the CCA.  Further, for the reasons described, the Court of Claims did not err when it allowed plaintiffs to proceed with their claims against the Governor, Earley, Ambrose, and all other defendants in the Court of Claims, or when it granted summary disposition in favor of defendants on plaintiffs' constitutional claim for injury to bodily integrity.

Affirmed.

/s/ Kathleen Jansen
/s/ Karen M. Fort Hood