*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

---

JENNIFER JANSSEN-ROGERS, and BROOKE
ROSENBAUM,

        Plaintiffs-Appellees,

v

DEPARTMENT OF ENVIRONMENT, GREAT
LAKES, AND ENERGY, and ERIC OSWALD,

        Defendants-Appellants.

UNPUBLISHED
January 29, 2026
9:20 AM

No. 369025
Court of Claims
LC No. 21-000246-MM

---

DARETHA BRAZIEL, Individually and as Next
Friend of RB, DB, and DR, Minors, KEESHA
JONES, Individually and as Next Friend of KJ, DJ,
TMC, TC, and KB, Minors, IEASHA JONES,
MICHAEL D. BRIGHAM, REBECCA
BRANSCUMB, STACEY BRANSCUMB, and
EMMA KINNARD,

        Plaintiffs-Appellees,

v

DEPARTMENT OF ENVIRONMENT, GREAT
LAKES, AND ENERGY, ERIC OSWALD,
DEPARTMENT OF HEALTH AND HUMAN
SERVICES, and DIRECTOR OF DEPARTMENT
OF HEALTH AND HUMAN SERVICES,

        Defendants-Appellants.

No. 369026
Court of Claims
LC No. 22-000046-MM

---

OLIVER KAVANAUGH, Individually and as Next
Friend of KNR, Minor,

-1-

Plaintiffs-Appellees,

v

No. 369027
Court of Claims
LC No. 22-000050-MM

DEPARTMENT OF ENVIRONMENT, GREAT
LAKES, AND ENERGY, and ERIC OSWALD,

Defendants-Appellants.

Before: KOROBKIN, P.J., and MURRAY and MALDONADO, JJ.

PER CURIAM.

These consolidated putative class-action appeals arose from high levels of lead in the tap water in Benton Harbor (the City). Defendants appeal by leave granted[1] the opinion and order of the Court of Claims denying defendants' motion for summary disposition under MCR 2.116(C)(7) (statute of limitations). Plaintiffs are City residents and business owners who brought claims for personal injury and property damages resulting from lead in the municipal water. Defendants argue that the Court of Claims failed to apply the correct standards for deciding motions under MCR 2.116(C)(7). Defendants also argue that plaintiffs failed to file their complaints or notice of intent to sue within six months of accrual of their claims, as required under the Revised Judicature Act, 600.101 *et seq*. We disagree and affirm.

## I. BACKGROUND

Under the Safe Drinking Water Act, MCL 325.1001 *et seq*., the Department of Environment, Great Lakes, and Energy (EGLE)[2] is responsible for the promulgation of rules setting water-quality standards and establishing requirements for the safe operation of water systems. MCL 325.1005. EGLE has promulgated a set of administrative rules known collectively as the Lead and Copper Rule (LCR). See Mich Admin Code, R 325.10401a; Mich Admin Code, R 325.10410; Mich Admin Code, R 325.10604f; Mich Admin Code, R 325.10710a; Mich Admin Code, R 325.10710b; Mich Admin Code, R 325.10710c; Mich Admin Code, R 325.10710d.

Rule 325.10604f(6) requires water suppliers to remove lead service lines from their systems over time. Rule 325.10710a(4) requires suppliers to monitor their systems for lead by collecting samples from consumers over six-month periods. The LCR specifies "action levels" of

---

[1] *Janssen-Rogers v EGLE*, unpublished order of the Court of Appeals, entered June 12, 2024 (Docket No. 369025); *Braziel v EGLE*, unpublished order of the Court of Appeals, entered June 12, 2024 (Docket No. 369026); *Kavanaugh v EGLE*, unpublished order of the Court of Appeals, entered June 12, 2024 (Docket No. 369027).

[2] The former Department of Environmental Quality was reorganized and renamed as EGLE in 2019. Some of the events involved in this case occurred before this name change, but, for convenience, we consistently use "EGLE."

lead concentration to protect the public in the event of excessive leaching of lead from pipes and fixtures into drinking water.  Mich Admin Code, R 325.10401a; Mich Admin Code, R 325.10604f(2)(e)(i); Mich Admin Code, R 325.10604f(5).  If an "action-level exceedance" (ALE) occurs, the LCR requires the water supplier—the City in the present cases—to take certain actions to protect the public, including public education, changing the treatment protocol, and expediting the replacement of lead service lines.  Mich Admin Code, R 325.10401a; Mich Admin Code, R 325.10604f(2)(e)(i); Mich Admin Code, R 325.10604f(5).  Through December 31, 2024, an action level for lead was considered to be reached when 10% of the samples collected from consumer taps were at or above 0.015 milligrams per liter, or 15 parts per billion (ppb).  Mich Admin Code, R 325.10604f(1)(c); Mich Admin Code, R 325.10401a, Table 1.

During the summer of 2018, the City collected residential water samples that had a 90th percentile of 22 ppb, thus constituting an ALE for the City's water system.  In October 2018, EGLE sent the City notice of the ALE and detailed the actions required of the City in response, including distributions of a public advisory and educational materials, and proposing a corrosion-control treatment plan or study.

Eight days later, the City distributed a public advisory letter to all of the addresses in the water system with information about the ALE, resources for further information, and a list of best practices to "reduce your risk of lead exposure," including the following:

• Run your water to stable, cold temperatures (usually 3 to 5 minutes) before drinking to flush out any potential contaminants.

• Use cold water tap for drinking or cooking.

• Use bottled water to prepare baby formula.

The City also distributed the public advisory to the media and held a press conference.  A month later, the City mailed educational materials to water-system customers, which included the following "steps you can take to reduce your exposure to lead in your water":

1. Run your water to flush out lead. . . .

2. Use cold water for cooking and preparing baby formula. . . .

* * *

4. Look for alternative sources or treatment of water.  You may want to consider purchasing bottled water or a water filter. . . .

A January 2019 EGLE internal memorandum indicated that EGLE was aware that the City was "not following through on their original public commitments . . . to provide bottled water or filters to residents with high lead results."  At a town hall meeting later that month, the Department of Health and Human Services (DHHS) announced that water filters would be available for the City's water customers to pick up.

The City hired a consulting engineering company to help with corrosion control, which recommended Carus 8600, a phosphate-based corrosion inhibitor. EGLE approved the treatment and issued the City a permit to implement it. The City began doing so in March 2019. During the same month, the City entered into an administrative consent order with EGLE to address several issues with the management of the system, many unrelated to the ALE.

The results from the residential water samples that the City collected during the first and second halves of 2019 again constituted ALEs. In response, the City distributed public advisories and educational materials with lists of recommendations for reducing the risk of lead exposure. The recommendations varied slightly with each publication, but collectively included using filters in households with children and pregnant women; using bottled water; flushing pipes "at least five minutes" before drinking the water; using only cold water for drinking, cooking, or preparing baby formula; considering the purchase of bottled water; cleaning faucet aerators every six months; identifying older plumbing fixtures; testing children for lead exposure; and testing household water for lead.

After the third ALE occurrence, EGLE designated a new treatment protocol for the City on the basis of a third-party consultant's recommendation, exercising its broad authority under MCL 325.1015(1), Rule 325.10604f(2)(c), and Rule 325.10604f(3)(h).

The City's residential water sampling during 2020 and the first half of 2021 produced a fourth, fifth, and sixth ALE. For each, the City again distributed a public advisory and educational materials with a list of recommendations, which varied slightly with each publication and continued to include some combination of using cold water or filters, flushing, cleaning faucet aerators, replacing old plumbing fittings, and considering the use of bottled water—while never advising the users not to drink the water.

In June 2021, the United States Environmental Protection Agency (EPA) awarded the City a grant to replace lead service lines. In September 2021, Governor Gretchen Whitmer asked the Legislature to approve an additional $20 million for the City's efforts in replacing lead service lines. Also, in September 2021, a group of concerned individuals and entities submitted a petition to the EPA, arguing that the actions of EGLE and the City had been "grossly inadequate" to address the lead contamination and had violated the state LCR and the federal equivalent. The petition requested, among other things, that the EPA help to deliver "emergency bottled water" to residents of the City and conduct a study on the effectiveness of filters.

In late September 2021, a Senior Advisor on Energy and Environment in the Executive Office of the Governor began an e-mail exchange with lobbyist Andy Leavitt concerning a "pamphlet" that Leavitt understood was either planned for distribution, or had been distributed, to City residents. Leavitt found the "pamphlet" inadequate because it never told the residents to stop drinking the water. Leavitt elaborated as follows:

> Given the high levels of lead in the water (up to 889 ppb have been measured and filters are only certified to remove lead at 150 ppb and lower) and the unknowns about filter performance in Benton Harbor's water quality, no one should be relying on filters. Bottled water should be delivered to all residents for all drinking and cooking water. While filters should not be used at this time, no one should be asking a resident to find their own certified filter.

On the same day, the Governor's advisor forwarded Leavitt's e-mail to an EGLE employee without significant comment. The next day, the employee forwarded the e-mail to Liesl Eichler Clark, Director of EGLE, without comment, who forwarded the e-mail to the DHHS without comment. An EGLE press release, issued the same day that Director Clark received this e-mail, announced that free bottled water would become available at locations in the City over the next week.

Less than a week later, both the EGLE and the DHHS announced that, "[o]ut of an abundance of caution to help ensure the health and safety of [the City] residents, the availability of bottled water is being expanded in the city and residents are being encouraged to use bottled water for cooking, drinking, brushing teeth, rinsing foods and mixing powdered infant formula." The press releases went on to explain that "[t]he EPA is conducting a filter effectiveness study to gather data and provide confidence in the effectiveness of water filters to reduce lead in drinking water," and promise that "free bottled water will be provided as long as needed."[3]

On October 14, 2021, Governor Whitmer issued Executive Order 2021-6, directing departments and agencies to "expeditiously take all appropriate action to ensure residents of [the City] have immediate access to free bottled water for consumption through distribution sites and drop-off delivery until further notice." A week later, Director Clark testified before the House Oversight Committee, stating that the City's residents should be drinking bottled water.

Water samples collected from August to November 2021 did not result in ALEs.

The plaintiffs in Docket No. 369025 filed their class-action complaint on December 29, 2021. The plaintiffs in Docket No. 369036 filed their class-action complaint on April 13, 2022, after first filing a case in federal court in the fall of 2021. See *Braziel v Whitmer*, unpublished opinion of the United States District Court for the Western District of Michigan, issued September 28, 2023 (Case No. 1:21-cv-960). The plaintiffs in Docket No. 369027 filed their class-action complaint on April 21, 2022. All three groups of plaintiffs alleged that "ongoing since at least 2018, Plaintiffs have been subjected to lead contamination in their drinking water."

Plaintiffs filed a consolidated amended complaint on December 5, 2022, noting that the claims against the director defendants were in their official capacities. Regarding the "nature of the action," plaintiffs alleged as follows:

> 8. [Beginning with the first ALE,] the State undertook a series of affirmative, deliberate, and conscious acts and decisions directed at Benton Harbor, which ultimately caused thousands of people to drink and use unsafe, lead-contaminated water from a system the State knew had higher lead levels . . . than even the Flint's system had ever recorded.
>
> 9. The State dictated and oversaw the corrosion control scheme that Benton Harbor used to mitigate the lead in its water. However, when EGLE discovered

---

[3] Five months later, the EPA issued a press release stating that, "[a]fter analyzing water samples from about 200 [City] homes, results show that when used properly, filters are effective at reducing lead in drinking water."

that the corrosion control scheme it chose was not working, and may have been worsening the crisis, it did nothing to change the scheme. . . .

10. At the same time, the State carelessly misled the community about the severe health risks posed by Benton Harbor's lead-contaminated water and what could be done to mitigate those risks. To the extent residents received any public information about the crisis, the materials *did not tell them* that the water was unsafe and that they should not drink or use it for hygienic purposes. . . .

\* \* \*

16. Not until October 14, 2021—the date of Governor Whitmer's executive declaration order declaring the water unsafe to drink and authorizing a bottled water emergency—did Plaintiffs and the residents learn that the water was unsafe to drink, cook, wash, bathe, and/or brush one's teeth with.

Plaintiffs raised claims under the state Constitution: violation of the substantive due-process[4] right of bodily integrity against all defendants, and an uncompensated taking of property[5] against EGLE and Eric Oswald, in his official capacity as Director of EGLE's Drinking Water and Environmental Health Division, and the DHHS. Plaintiffs attached to their consolidated amended complaint a City water-quality report, EGLE public education material that endorsed flushing and filter use, EGLE internal e-mails, a report of the results of the EPA filter study, an EPA Administrative Order, an EPA press release regarding the filter testing, a letter from the director defendants to the EPA, and an EPA inspection report of the City's water facilities.

Before the close of discovery, defendants moved for summary disposition under MCR 2.116(C)(7), arguing that the lawsuits were barred because plaintiffs failed to file complaints or notices of intent within six months after their claims accrued, as required under MCL 600.6431(4).[6]

---

[4] Const 1963, art 1, § 17, states, "No person shall . . . be deprived of life, liberty or property, without due process of law."

[5] Const 1963, art 10, § 2, states, "Private property shall not be taken for public use without just compensation therefore being first made or secured in a manner prescribed by law."

[6] MCL 600.6431 states, in pertinent part, as follows:

(1) Except as otherwise provided in this section, a claim may not be maintained against this state unless the claimant, within 1 year after the claim has accrued, files in the office of the clerk of the court of claims either a written claim or a written notice of intention to file a claim against this state or any of its departments, commissions, boards, institutions, arms, or agencies.

\* \* \*

Defendants argued that plaintiffs should have discovered their claims more than six months before they filed suit, given the information that the City and defendants distributed about the ALEs, as well as the associated media coverage. Defendants submitted 71 exhibits in support of their motion, including 22 news articles and affidavits from Oswald and three other EGLE employees.

Plaintiffs responded that the accrual depended on when the tortious conduct *and* harm had occurred, which involved questions of fact making summary disposition premature. Plaintiffs contended that their claims accrued, not upon their first consumption of the lead-contaminated water, but at some time after 2018—because their injuries developed gradually—and that defendants' conscience-shocking behavior occurred as they failed to correct previous actions while continuing to downplay the dangers. Plaintiffs similarly asserted that their property claims did not arise until the executive directive made the extent of the contamination publicly known.

Alternatively, plaintiffs argued that the fraudulent concealment exception applied to toll the period of limitations. Plaintiffs argued that they pleaded affirmative acts on the part of defendants that were designed to prevent the discovery of their claims. Plaintiffs acknowledged that fraudulent concealment does not apply when the plaintiff knows of the existence of a cause of action, but asserted that their knowing that lead was in the water did not equate with knowing that the water was dangerous, particularly in light of governmental assurances that the problem was being adequately addressed. Plaintiffs did not submit any evidence with their response to the motion.

In reply, defendants argued that dismissal was proper because plaintiffs had failed to present any evidence to rebut their evidence contradicting plaintiffs' allegations. Defendants also argued that they took no affirmative actions to conceal potential claims from plaintiffs.

At the motion hearing, plaintiffs argued that summary disposition was inappropriate because evidence regarding what defendants knew about the risks of lead contamination, and when they knew it, was in defendants' possession.

In its opinion and order denying the motion, the Court of Claims reasoned as follows:

> Defendants argue that plaintiffs must produce evidence to contradict the documents attached to defendants' motion for summary disposition. Defendants confuse an MCR 2.116(C)(7) motion with an MCR 2.116(C)(10) motion. . . . In the (C)(10) context, when the moving party has supported the motion, the nonmovant cannot rest upon the allegations in the complaint, but instead, through evidence, must set forth specific facts establishing a genuine issue of fact for trial.
>
> A (C)(7) motion differs, fundamentally, from a motion for summary disposition under MCR 2.116(C)(10) because a motion under MCR 2.116(C)(7)

---

(4) For a claim against this state for property damage or personal injuries, the claimant shall file the claim or notice under subsection (1) with the clerk of the court of claims within 6 months after the event that gives rise to the claim.

presents a question of law for the Court to decide. Thus, in the (C)(7) context, the movant is not required to submit supportive material, and the nonmovant is not required to reply with supporting documentation. [Citations omitted.]

Turning to defendants' argument concerning the date of accrual of the claims, the Court of Claims first noted that "[t]he Court of Appeals has held that the requirements of the notice statute[7] do not apply to state employees," and that, "[t]herefore, even if plaintiffs' claims against EGLE and DHHS did not comply with MCL 600.6431, their claims against the individual state employees would survive dismissal." Next, the Court of Claims reasoned that, although defendants presented some evidence that potentially contradicted some of plaintiffs' allegations, questions of fact remained regarding when the claims accrued.

Finally, addressing plaintiffs' contention that defendants fraudulently concealed their claims, thereby tolling the statute of limitations, the Court of Claims reasoned as follows:

[P]laintiffs assert that defendants covered up the danger of the lead exposure, down-played the risk of consuming the water, and failed to take proper corrective measures to address the lead, all while knowing that the water was unsafe to consume. Plaintiffs argue that although defendants announced the presence of lead in the water in October 2018, it was not until October 2021 that plaintiffs learned the key fact triggering their lawsuits: that the water was unsafe to consume.

* * *

. . . [T]he plaintiffs had no reason to know that defendants engaged in any culpable conduct simply because the water in Benton Harbor contained lead. . . .

* * *

The Court concludes that defendants' motion raises questions of fact about whether defendants engaged in affirmative acts to cover up the extent of the lead contamination and defendants' role in the ongoing water crisis. Plaintiffs have attached the documents to their complaint that they currently possess and that support their claims. But plaintiffs have not had the opportunity to engage in discovery, including by taking the depositions of the representatives who provided affidavits to support defendants' motion.

* * *

. . . Defendants have presented evidence that they argue contradicts [plaintiffs'] allegations, raising questions of fact to be explored in discovery.

---

[7] MCL 600.6431.

-8-

For these reasons stated, the Court of Claims denied defendants' motion without prejudice. This appeal followed.

## II. STANDARD OF REVIEW

"Appellate review of the grant or denial of a summary-disposition motion is de novo, and the court views the evidence in the light most favorable to the party opposing the motion." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

## III. APPLICATION OF THE MCR 2.116(C)(7) STANDARD

Defendants argue that the Court of Claims failed to properly consider defendants' evidence submitted to contradict key allegations in plaintiffs' complaint and thus failed to properly apply the MCR 2.116(C)(7) standard to defendants' motion to for summary disposition. We disagree.

MCR 2.116(C)(7) authorizes a court to grant a motion for summary disposition on the basis of "release, payment, prior judgment, immunity granted by law, statute of limitations,[8] statute of frauds, an agreement to arbitrate or to litigate in a different forum, infancy or other disability of the moving party, or assignment or other disposition of the claim before commencement of the action."

MCR 2.116(G) provides as follows:

> (2) Except as to a motion based on subrule (C)(8) or (9), affidavits, depositions, admissions, or other documentary evidence may be submitted by a party to support or oppose the grounds asserted in the motion.
>
> (3) Affidavits, depositions, admissions, or other documentary evidence in support of the grounds asserted in the motion are required
>
> > (a) when the grounds asserted do not appear on the face of the pleadings, or
> >
> > (b) when judgment is sought based on subrule (C)(10).
>
> (4) A motion under subrule (C)(10) must specifically identify the issues as to which the moving party believes there is no genuine issue as to any material fact. When a motion under subrule (C)(10) is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his or her pleading, but must, by affidavits or as otherwise provided in this rule, set forth specific facts showing that there

---

[8] In *Rusha v Dep't of Corrections*, 307 Mich App 300, 311-312; 859 NW2d 735 (2014), this Court explained that it saw "no reason . . . to treat statutory notice requirements differently" from statutes of limitations, because both are procedural requirements restricting legal remedies, not legal rights.

is a genuine issue for trial. If the adverse party does not so respond, judgment, if appropriate, shall be entered against him or her.

(5) The affidavits, together with the pleadings, depositions, admissions, and documentary evidence then filed in the action or submitted by the parties, must be considered by the court when the motion is based on subrule (C)(1)-(7) or (10). . . .

(6) Affidavits, depositions, admissions, and documentary evidence offered in support of or in opposition to a motion based on subrule (C)(1)-(7) or (10) shall only be considered to the extent that the content or substance would be admissible as evidence to establish or deny the grounds stated in the motion.

A motion under MCR 2.116(C)(7) "ultimately presents a question of law for the court to decide rather than a question of fact within the jury's province." *Dextrom v Wexford Co*, 287 Mich App 406, 430; 789 NW2d 211 (2010). Therefore, neither the movant nor the party opposing a (C)(7) motion necessarily must file supportive material. *Maiden v Rozwood*, 461 Mich 109, 119; 597 NW2d 817 (1999); *Patterson v Kleiman,* 447 Mich 429, 434 n 6; 526 NW2d 879 (1994). However, if such documentary evidence is submitted, the court must consider it, if the substance or content of the material is admissible. MCR 2.116(G)(5); *Odom v Wayne Co*, 482 Mich 459, 466; 760 NW2d 217 (2008); *Maiden*, 461 Mich at 119; *Patterson*, 447 Mich at 432.

While applying MCR 2.116(C)(7) in *Patterson*, 447 Mich at 433, our Supreme Court recognized that the requirements to "consider all well-pleaded allegations as true," and to consider all the evidence submitted by the movant, were "directly contradictory." Indeed, if a "court would be required simply to treat the allegations of the complaint as true" regardless of the evidence, there would be no reason to review the evidence at all. *Id*. at 434. Therefore, the Supreme Court qualified the general rule by stating that "the contents of the complaint must be accepted as true *unless specifically contradicted* by the affidavits or other appropriate documentation submitted by the movant." *Id*. at 434 n 6 (emphasis added). See also *Mays v Governor*, 506 Mich 157, 181; 954 NW2d 139 (2020) (*Mays II*) (opinion by BERNSTEIN, J.); *Willett v Waterford Charter Twp*, 271 Mich App 38, 45; 718 NW2d 386 (2006). Accordingly, when evidence has been produced in support of, or opposition to, an MCR 2.116(C)(7) motion, "court[s] must look to the pleadings, affidavits, or other documentary evidence to see if there is a genuine issue of fact." *Huron Tool & Engineering Co v Precision Consulting Servs, Inc*, 209 Mich App 365, 377; 532 NW2d 541, 547 (1995). See also *Odom*, 482 Mich at 466; *Maiden*, 461 Mich at 119.

Defendants rely on *Patterson*, 447 Mich at 434, and *Huron Tool & Engineering Co*, 209 Mich App at 377, because the nonmovants in those cases created a genuine issue of material fact by submitting their own evidence that opposed the evidence the movants had submitted with their MCR 2.116(C)(7) motions. However, such production is not necessary if the movant's evidence fails to specifically contradict the nonmovant's allegations. See *Patterson*, 447 Mich at 434 n 6. Defendants sought dismissal on the legal basis that MCL 600.6431 barred plaintiffs' claims, which gave rise to an evidentiary burden of directly contradicting plaintiffs' allegations. See *Patterson*, 447 Mich at 434 n 6. Determining accrual dates for claims involving the effects of lead

-10-

contamination on the human body, or on the housing market, is not as simple as the factual predicates underlying MCR 2.116(C)(7) motions when a single document might conclusively establish that a release, payment, prior judgment, or agreement to arbitrate requires dismissal. See *Mays v Snyder*, 323 Mich App 1, 29-30; 916 NW2d 227 (2018) (*Mays I*), aff'd 506 Mich 157 (*Mays II*).

In the present cases, we conclude that the Court of Claims properly considered the evidence that defendants presented and determined that the evidence did not fully contradict plaintiffs' contentions that their claims were not time barred. "[I]f a question of fact exists so that factual development could provide a basis for recovery, caselaw states that dismissal without further factual development is inappropriate." *Dextrom*, 287 Mich App at 431. See also *Mays I*, 323 Mich App at 30. Because the trial court considered the evidence presented in the proper context of whether it eliminated the questions of fact presented by plaintiffs' allegations, the court properly applied the MCR 2.116(C)(7) standard.

## IV. FRAUDULENT CONCEALMENT

Defendants next argue that plaintiffs' claims were time barred and the fraudulent concealment exception does not apply. We disagree.

As noted, MCL 600.6431(4) creates a six-month deadline for filing "a claim against this state for property damage or personal injuries." However, "[t]he fraudulent-concealment exception is a legislatively created exception to statutes of limitation," *Mays I*, 323 Mich App at 38, which may toll both the applicable statute of limitations and the statutory notice periods in cases before the Court of Claims, *id*. at 44. To that end, MCL 600.5855 provides as follows:

> If a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations.

By its plain language, this creates two requirements to apply the fraudulent concealment exception to the six-month deadline. First, for fraudulent concealment to toll the running of a limitations period, an affirmative act or misrepresentation must manifest the fraud. *Dillard v Schlussel*, 308 Mich App 429, 443; 865 NW2d 648 (2014). Silence alone is not enough. *Id*. Rather, the defendant must have resorted to some artifice planned to prevent inquiry or escape investigation, and to mislead or otherwise hinder the acquisition of information disclosing a right of action. *Reserve at Heritage Village Ass'n v Warren Fin Acquisition, LLC*, 305 Mich App 92, 122; 850 NW2d 649 (2014). Failure to warn is not such an affirmative act or misrepresentation. *Doe*, 264 Mich App at 645-646.

The second requirement for tolling is the plaintiff's inability to discover the defendant's breach through the use of reasonable diligence: When an express discovery rule exists,[9] "a plaintiff's claim accrues when the plaintiff discovers, or through the exercise of reasonable diligence, should have discovered . . . (1) an injury, and (2) the causal connection between plaintiff's injury and the defendant's breach [of duty to the plaintiff]." *Lemmerman v Fealk*, 449 Mich 56, 76; 534 NW2d 695 (1995) (quotation marks and citation omitted). "It is not necessary that a plaintiff be able to *prove* each element of the cause of action before the period of limitation begins to run." *Jackson Co Hog Producers v Consumers Power Co*, 234 Mich App 72, 78; 592 NW2d 112 (1999) (emphasis added). Rather, it "is enough that he knows a cause of action exists in his favor, and when he has this knowledge, it is his own fault if he does not avail himself of those means which the law provides for prosecuting or preserving his claims." *Moll v Abbott Laboratories*, 444 Mich 1, 24; 506 NW2d 816 (1993), abrogated not in relevant part by *Trentadue v Buckler Automatic Lawn Sprinkler Co*, 479 Mich, 378, 393; 738 NW2d 664 (2007) (holding that the Legislature abrogated the common law discovery rule by codifying the rules for specific causes of action) (quotation marks and citation omitted).

It follows, then, that when the plaintiff knows of the cause of action, there can be no concealment. *Doe v Roman Catholic Archbishop of the Archdiocese of Detroit*, 264 Mich App 632, 646-647; 692 NW2d 398 (2004). A plaintiff will be held to know what they ought to know by the exercise of ordinary diligence. *Eschenbacher v Hier*, 363 Mich 676, 681-682; 110 NW2d 731 (1961). Therefore, there can be no tolling of the limitations period if the plaintiff could have discovered the fraud from public records. *Heap v Heap*, 258 Mich 250, 263; 242 NW 252 (1932).

In summary, a plaintiff claiming fraudulent concealment must plead the acts or mis-representations that constituted fraudulent concealment, and "prove that the defendant committed affirmative acts or misrepresentations that were designed to prevent subsequent discovery." *Mays I*, 323 Mich App at 39 (quotation marks and citation omitted).

On appeal, plaintiffs rely primarily on *Mays I*, in which the plaintiffs also argued that the statute of limitations applicable to their constitutional claims was tolled by the defendants' fraudulent concealment, obligating this Court to address the potential complexities of the questions of fact involved. *Mays I*, 323 Mich App at 29-30. The plaintiffs alleged that the defendants failed to take appropriate measures to address the threat created by the contaminated water, and fraudulently concealed the exposure and attendant danger by telling Flint residents that the water was safe to drink when they knew otherwise. *Id*. at 21.

This Court first held that the plaintiffs had sufficiently pleaded acts or misrepresentations constituting fraudulent concealment. *Mays I*, 323 Mich App at 18, 45. This Court next held that if the plaintiffs could prove that the defendants concealed information such that the plaintiffs "could not, or should not, have known of the existence of the causes of action until a date less than six months prior to the date of their complaint, application of the fraudulent-concealment exception will fully apply. . . ." *Id*. at 44-45. This Court then held that, given the undeveloped record, further factual development might provide a basis for recovery, and therefore summary disposition was

_____

[9] A "discovery rule" may not be implied, but must be expressly provided by statute. *Trentadue v Buckler Automatic Lawn Sprinkler Co*, 479 Mich 378, 391-392; 738 NW2d 664 (2007).

-12-

premature. *Id*. at 38, 44-45 (noting that the state possessed the information necessary to decide the question of fraudulent concealment).

In the instant case, the essence of plaintiffs' argument is that, until October 2021, defendants were telling plaintiffs that, although there was lead contamination in the water, the City and defendants were addressing the problem, and that the in-home methods of risk abatement that the defendants recommended—flushing, cold water, filters—were enough to protect plaintiffs from harm. Likewise, defendants' messaging gave plaintiffs no reason to think the lead was causing physical damage to the plumbing in their properties. Plaintiffs allege that they initially had no reason to investigate beyond the public information defendants provided. Plaintiffs further allege that when defendants changed course and began instructing City residents to drink bottled water in late October 2021, plaintiffs *then* discovered the limitations of filtering and understood the dangerousness of the levels of contamination to persons and property. Therefore, until 2021, plaintiffs did not have reason to know, or even suspect, that defendants had committed any acts rising to the level of plaintiffs' eventual claims when they were first exposed to the potentially injurious water. Defendants' evidence offered no facts to disprove this characterization of defendants' public messaging up to late October 2021.

Although this case differs from *Mays* in that plaintiffs at least knew there was some contamination while the alleged fraudulent concealment was taking place, see *Mays I*, 323 Mich App at 27-28, plaintiffs have presented sufficient uncontradicted allegations that what they knew about the contamination in October 2018 through early October 2021 was not enough to charge them with knowledge of the existence of plaintiffs' constitutional claims. See MCL 600.5855; *Lemmerman*, 449 Mich at 76. Because questions of fact remained regarding whether defendants' fraudulent concealment tolled plaintiffs' claims, the Court of Claims properly denied defendants' motion for summary disposition.

## V. CONCLUSION

The Court of Claims properly considered plaintiffs' allegations and properly concluded that defendants' evidence did not eliminate the questions of fact that arose from plaintiffs' claims. Additionally, because plaintiffs made allegations constituting defendants' fraudulent concealment of their claims, which defendants' evidence did not contradict, the Court of Claims properly denied defendants' motion for summary disposition. Therefore, we need not address defendants' remaining arguments.

Affirmed.

/s/ Daniel S. Korobkin
/s/ Allie Greenleaf Maldonado